*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0317P (6th Cir.)
File Name: 03a0317p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

HUNTER LEE WILLIAMS
(02-5001); NICHOLAS
EDWARD GEORGE (02-5002);
and GEOFFREY HILLMAN
LEEK (02-5003),
*Defendants-Appellants.*

Nos. 02-5001/
5002/5003

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 00-00045—James H. Jarvis, District Judge.

Argued: August 7, 2003

Decided and Filed: September 4, 2003

Before: KEITH and COLE, Circuit Judges; WEBER,
District Judge.[*]

_____

[*] The Honorable Herman J. Weber, United States District Judge for
the Southern District of Ohio, sitting by designation.

_____

### COUNSEL

**ARGUED:** T. Clifton Harviel, Jr., HARVIEL LAW
OFFICE, Memphis, Tennessee, Kim A. Tollison, FEDERAL
DEFENDER SERVICES, Knoxville, Tennessee, Richard L.
Gaines, ELDRIDGE, IRVINE & GAINES, Knoxville,
Tennessee, for Appellants. David P. Folmar, Jr.,
ASSISTANT UNITED STATES ATTORNEY, Knoxville,
Tennessee, for Appellee. **ON BRIEF:** T. Clifton Harviel,
Jr., HARVIEL LAW OFFICE, Memphis, Tennessee, Kim A.
Tollison, FEDERAL DEFENDER SERVICES, Knoxville,
Tennessee, Richard L. Gaines, ELDRIDGE, IRVINE &
GAINES, Knoxville, Tennessee, Charles W. B. Fels,
RITCHIE, FELS & DILLARD, Knoxville, Tennessee, for
Appellants. David P. Folmar, Jr., ASSISTANT UNITED
STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

_____

### OPINION

_____

R. GUY COLE, JR., Circuit Judge. Defendants appeal the
district court's denial of their motions to suppress the fruits of
a warrantless entry and search by federal agents of a rental
property in Knoxville, Tennessee. After the owner of the
property became concerned about a water leak, she entered
the residence and became suspicious of criminal activity. She
notified federal authorities, who then accompanied the
woman into the rental property. This entry led to the
discovery of a hydroponic marijuana-growing operation,
searches of two other residences, and the arrests of
Defendants. The district court denied Defendants'
suppression motions, finding that exigent circumstances–the
possible water leak–justified the warrantless entry. For the
reasons stated below, we REVERSE the district court's denial

of Defendants' motions and REMAND for further proceedings.

## I. BACKGROUND

The charges against Defendants Geoffrey Hillman Leek, Nicholas Edward George, and Hunter Lee Williams arise out of a warrantless entry by federal agents into a residence at 10223 Bluegrass Road, Knoxville, Tennessee (the "Bluegrass residence") on October 22, 1999. The owner of this property, Theresa Smith, leased the residence to Leek and George. Smith, an elderly widow who owns seven rental properties in the Knoxville area, testified that she had no complaints about Leek or George, and that Leek always paid the rent, $850.00 per month, on time and in cash. Under the lease, Smith was responsible for the water bill.

On October 7, 1999, Smith received a bill for the combined water usage at four of her rental properties—the Bluegrass residence, a modular home, a trailer, and a camper. On October 22, 1999, when Smith prepared to pay the bill, she concluded that it was higher than normal. Specifically, Smith testified that the October 7 bill totaled $39.16, while the bill for the previous month totaled $27.86. Notably, the November 1999 bill totaled $46.41 and Smith testified that a bill of nearly forty dollars was not unusual. However, Smith claimed that a bill of nearly forty dollars was odd for the period measured in the October 7 bill because two of the residences were vacant.

Approximately five years earlier, a water leak in the kitchen caused damage to the Bluegrass residence. Thus, suspecting a possible water leak, Smith set out to inspect each of the four properties. Smith did not call any of her tenants in advance. Smith inspected the modular home, trailer, and camper, but found no leaks. Fearing a dog that Leek and George owned, Smith asked her niece, Lucille Barnett, to accompany her to inspect the Bluegrass residence.

Around 10:30 a.m. on October 22, Smith and Barnett arrived at the Bluegrass residence. Although the gate was open, Leek, George, and the dog were not at the residence. Smith used a copy of the house key to enter the Bluegrass residence. As she and Barnett entered, Smith smelled something odd. Smith and Barnett saw leaves all over the floor, and no furniture in the residence save a punching bag and trash cans. Soft music was playing. The pair walked through the living room and inspected the kitchen, finding no leaks. Although they saw no leaks nor any water or water damage, they left without checking the entire residence because it was dark, the lights did not work, and they were afraid.

After they left, Barnett called the Drug Enforcement Agency ("DEA"). Barnett explained to DEA Agent Tim Teal that Smith had received a high water bill for several rental properties that she owned, including the Bluegrass residence. She explained that she had accompanied her aunt to the Bluegrass residence to look for leaks, and based on the plant material and lack of light and furniture in the residence, they suspected drug activity. Barnett also informed Teal that Leek always paid the rent in cash. Based on this information, Agent Teal suspected that the residence was either a "[m]arijuana grow or marijuana stash house, one or the other." Agent Teal agreed to meet with the women at the Bluegrass residence at 1:00 p.m. that day.

Agent Teal asked DEA Agent David Henderson, who was also employed by the Knox County Sheriff's Department, to accompany him. When they arrived at the Bluegrass residence at 1:20 p.m., the women explained that Smith owned the Bluegrass residence, but rented it to Leek and George. Reiterating some of the information that Barnett had relayed to Agent Teal on the telephone, Smith and Barnett showed the agents the lease, described the water bill, and explained that they had checked the three other rental properties for a leak already.

Concerned that a possible water leak might ruin the new carpeting in the Bluegrass residence, Smith and Barnett initially asked the officers to inspect the premises for a leak. The agents declined to enter the residence alone because they "both agreed that [they] shouldn't do that." Smith then asked the agents to accompany her into the Bluegrass residence to check for a leak, telling them that she was afraid to go in by herself. After discussing whether they could accompany Smith into the residence, the agents decided that Agent Henderson would go with Smith in his capacity as a local law enforcement officer, rather than as a federal drug investigator.[1] Agent Teal testified, however, that he had no "real reason" to believe that anyone was in the residence.

Smith unlocked the door to the residence, and Agent Henderson accompanied her and Barnett inside. Barnett reemerged from the residence a few minutes later to get a flashlight from Agent Teal for Agent Henderson. Agent Henderson inspected the entire house, including the room containing a washer and dryer, the master bedroom, the bathrooms, and the kitchen—even looking under the kitchen sink. Agent Henderson did not find a water leak, but he did discover many marijuana plants.

Based on Agent Henderson's discovery of marijuana during the warrantless entry into the Bluegrass residence, the agents established surveillance there. Later in the day, Agent Henderson obtained state arrest warrants for Leek and George. The affidavit for these warrants was based entirely on information obtained from Agent Henderson's warrantless

entry into the Bluegrass residence. Relying on this information, Agent Henderson applied for and obtained a search warrant for the Bluegrass residence the same day. Meanwhile, Agent Teal learned that: Leek subscribed to electrical service for the Bluegrass residence, listed 305 Meridale Drive in Johnson City, Tennessee (the "Meridale residence") as his address on his driver's licence, but had a vehicle registered at 1311 Clinch Avenue, Apartment Three in Knoxville (the "Clinch residence"). Agent Teal also learned that George's driver's license listed the Clinch residence as his address, but George had a vehicle registered at the Meridale residence. Finally, Agent Teal learned that Leek and George receive mail at the Clinch residence.

Agents Teal and Henderson executed the search warrant for the Bluegrass residence at 10:30 p.m. on October 22, 1999. The agents discovered a hydroponic marijuana-growing operation, including 164 marijuana plants. On October 26, 1999, after observing Leek's vehicle parked outside, the officers knocked on the door of the Clinch residence to arrest him. Upon arrest, Leek consented to a search of the Clinch residence. During the search, the agents recovered marijuana, drug paraphernalia, opium, and sixteen hundred dollars in cash. During the course of this arrest, Leek made various incriminating statements to the agents. Based on the search of the Clinch residence, the agents decided to focus on the Meridale residence. Thus, police officers from Johnson City, Tennessee, acting on information provided by Agents Teal and Henderson, eventually executed the arrest warrant for George at the Meridale residence. The officers did not locate George in the residence, but they did see marijuana, and they arrested Hunter Williams, who was present there. The officers later sought and obtained a search warrant for the Meridale residence. Upon executing that search warrant, the officers recovered 295 marijuana plants, approximately eighty bundles of marijuana leaves, and implements used for growing marijuana, such as lights and a carbon dioxide enrichment system.

---

[1] Agent Henderson testified that the Sheriff's Department guidelines permitted him to enter the residence with Smith, to "protect her." As the district court observed, "These guidelines were never introduced into the record. Whether or nor the Sheriff's Department has 'guidelines' allowing deputies to enter homes in certain circumstances has no legal significance on the constitutionality of the warrantless entry into th[e] [Bluegrass] residence."

On March 8, 2000, Defendants Leek, George, and Williams, were charged in a five-count indictment ("Indictment") with conspiring to manufacture marijuana and to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846, and aiding and abetting each other in the commission of these offenses. Subsequently, Defendants filed motions to suppress the evidence against them on the grounds that the warrantless entry into the Bluegrass residence was not justified. The Government opposed the motions.

After a hearing, a magistrate judge issued a Report and Recommendation, concluding that exigent circumstances justified the warrantless entry into the Bluegrass residence and recommending denial of Defendants' motions. Upon review, the district court explained: "The only issue presented for review is whether Agent Henderson's initial warrantless entry into the Bluegrass Road residence was based on exigent circumstances under *United States v. Rohrig*, 98 F.3d 1506 (6th Cir. 1996)." Agreeing with the magistrate judge that the search was permissible under *Rohrig*, the district court adopted the findings of the magistrate judge and denied Defendants' motions to suppress.

In April 2001, Defendants George and Leek pled guilty to Count One of the Indictment, which alleged a conspiracy to manufacture, possess, and distribute one hundred or more marijuana plants, and Williams pled guilty to Count Five, which alleged aiding and abetting the possession with intent to distribute marijuana. On December 17, 2001, the district court sentenced George and Leek each to serve eighteen months of imprisonment to be followed by three years of supervised release. The same day, the district court sentenced Williams to serve fifteen months of imprisonment to be followed by three years of supervised release. Defendants specifically reserved their rights to appeal the denial of their suppression motions and now appeal such denial.

## II. ANALYSIS

As the district court concluded, if the warrantless entry into the Bluegrass residence was unconstitutional, all subsequent evidence was obtained unlawfully because the subsequent searches and arrest warrants were based on evidence and information derived solely from Agent Henderson's warrantless entry. Thus, our primary task is to assess whether the warrantless entry into the Bluegrass residence was constitutional.

### A. Warrantless Entry into the Bluegrass Residence

The district court held that the warrantless entry into the Bluegrass Residence was justified by exigent circumstances. Specifically, the district court found that Agent Henderson did not contravene the dictates of the Fourth Amendment when he accompanied, for her protection, "a very typical East Tennessee 'country woman,' who was insistent upon entering her residence 'come hell or high water,'" to look for a water leak in the darkened residence. On appeal, Defendants claim there was no exigency to justify the entry and, therefore, the agents should have sought a warrant. When reviewing a district court's decision to deny a motion to suppress, we review the district court's legal conclusions *de novo* and disturb its factual findings only if they are clearly erroneous. *United States v. Bates*, 84 F.3d 790, 794 (6th Cir. 1996).

The Fourth Amendment provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend IV. The "chief evil" against which the Fourth Amendment protects is the "physical entry of the home." *Payton v. New York*, 445 U.S. 573, 585 (1980). The Fourth Amendment requires that searches of the

home be reasonable. *See Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990). This reasonableness requirement generally requires police to obtain a warrant based upon a judicial determination of probable cause prior to entering a home. *See Payton*, 445 U.S. at 585-86. The Fourth Amendment prohibition against entering a home without a warrant applies equally whether the police enter a home to conduct a search or seizure or for some other purpose. *See Rohrig*, 98 F.3d at 1511-12. In the present case, because no warrant was obtained before Agent Henderson entered the Bluegrass residence with Smith and Barnett on October 22, 1999, the Government must overcome the presumption that the entry was unreasonable. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (citing *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 996 (6th Cir. 1994)).

There are a few well-defined and carefully circumscribed circumstances in which a warrant will not be required. *See Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (discussing exceptions to the warrant requirement); *see also United States v. Haddix*, 239 F.3d 766, 767 n.2 (6th Cir. 2001) (same). As noted above, the district court found that the "exigent circumstances" exception to the warrant requirement justified Agent Henderson's entry into the Bluegrass residence.

## 1. Exigent Circumstances

Exigent circumstances are situations where "'real immediate and serious consequences'" will "certainly occur" if a police officer postpones action to obtain a warrant." *Ewolski*, 287 F.3d at 501 (quoting *O'Brien*, 23 F.3d at 997 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984))); *see Thacker v. City of Columbus*, 328 F.3d 244, 253 (6th Cir. 2003). "The government bears the burden of proving [that] exigent circumstances existed." *Bates*, 84 F.3d at 794. This Court has explained that the following situations may give rise to exigent circumstances: "(1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to

prevent a suspect's escape; and (4) a risk of danger to the police or others." *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994) (internal citations omitted); *see Minnesota v. Olsen*, 495 U.S. 91, 100 (1990).

Of these potential exigencies, we must determine whether the "risk of danger" exigency applies under the circumstances of this case. As the Supreme Court has explained, "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey*, 437 U.S. at 392. The "'risk of danger' exigency" most frequently justifies "warrantless entries in cases where the Government is acting in something other than a traditional law enforcement capacity." *Rohrig*, 98 F.3d at 1515; *see, e.g., Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (holding warrantless entry into a burning building justified); *see also Johnson*, 22 F.3d at 680 (holding limited warrantless entry to free a victim who had been held against her will and sexually assaulted justified).

Because we find that Agent Henderson was neither faced with any true immediacy, nor confronted by any real danger that serious consequences would certainly occur to the police or others if he did not enter the Bluegrass residence, we conclude that exigent circumstances, in particular, the "risk of danger" exigency cannot justify Agent Henderson's warrantless entry. First, it is clear that time was not of the essence in attending to the possible water leak at the Bluegrass residence. In fact, the Government conceded at oral argument that there was no immediacy involved here. Specifically, the Government represented that the agents could have pursued alternative courses of action, such as impounding the residence and seeking a warrant, rather than entering the home without a warrant. We agree. Smith had waited two weeks after receiving the October 7 water bill before opening it on October 22 and concluding that there might be a leak. At that time, she suspected a leak and set out

to inspect for it.  On October 22, the water could have been leaking for the four weeks covered by the bill, as well as the two weeks during which she did nothing after receiving the bill.  Any damage would likely have been done, or at least noticeable, by October 22.  However, Smith did not rush to the Bluegrass residence after finding no leak in any of the other three rental properties.  Instead, she went to get Barnett before going into the residence.  Although Smith and Barnett did not check the entire residence when they entered at 10:30 a.m., they did not see a leak or evidence of water damage.

Instead of calling an emergency plumber or 911, Smith and Barnett made an appointment to meet with Agents Henderson and Teal concerning the possible water leak and their suspicion of drug activity.  The officers stopped for lunch on the way to the residence, and arrived late.  In fact, Agent Teal testified that he was not in a hurry to get to the residence.  Thus, Smith had willingly waited nearly three hours before Agents Henderson and Teal arrived at 1:20 p.m.  Even if a water leak that could potentially cause damage to a new carpet could be considered an emergency, the additional time it would have taken to obtain a search warrant was marginal under the circumstances of this case.  Significant time had already passed without any drastic consequences stemming from the possible, but far from certain, leak in the Bluegrass residence.

Second, any "risk of danger" to "the police or others" was created by the agents when they permitted Smith to reenter the Bluegrass residence.   The  officers testified that they entered the Bluegrass residence to protect Smith, who insisted on entering the residence. The agents did not believe anyone inside the Bluegrass residence was in need of aid. Rather, the agents were with Smith, who was safe outside the residence, but who insisted on going inside to search for a possible water leak. Thus, despite Smith's subjective belief that she needed to inspect the Bluegrass residence quickly, she was not in need of immediate aid.  Nothing in the record suggests that

Agent Henderson was unable to prevent Smith from entering the residence.  Insofar as Agent Henderson permitted Smith to enter the home, he essentially created the dangerous situation himself.   Law enforcement officers cannot manufacture exigent circumstances. *Ewolski*, 287 F.3d at 504 (quoting *United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir. 1984), for the proposition that "[p]olice officials . . . are not free to create exigent circumstances to justify their warrantless intrusions.").   Accordingly, we find that any danger to human life or limb, that is, to Smith or to the agents themselves, was the result of their own doing and cannot, therefore, justify the warrantless entry into the Bluegrass residence.

Third, other than the danger created by the agents, there was no "risk of danger" as that term is used in Fourth Amendment jurisprudence because the potential danger was merely the risk of damage to property and such risk was, at best, speculative.  Danger of water damage to a carpet is certainly not urgent within the meaning of the "risk of danger" exigency.  Precedent is clear that the "risk of danger" exigency applies only to situations involving the "need to protect or preserve life or avoid serious injury either of police officers themselves or of others."  *O'Brien*, 23 F.3d at 997 (citing *Mincey*, 437 U.S. at 392); *see Mincey*, 437 U.S. at 392 (explaining that a prompt warrantless entry into a home where a homicide just took place "to see if there are other victims or if a killer is still on the premises" is permissible under the Fourth Amendment, but that a four-day search of that home was unreasonable because there was no "emergency threatening life or limb").  Our decision in *Johnson* offers some clarity regarding the limits on the "risk of danger" exigency.  There, we explained that a limited warrantless entry by police officers responding to a call that a minor was being held in a closet in the apartment against her will was justified to free the minor who had been sexually assaulted. *Johnson*, 22 F.3d at 680.  However, we concluded that exigent circumstances did not justify the officers' seizure of

firearms found in the closet without a warrant because once the officers had freed the minor, "the police had ample time to secure the premises and to obtain a search warrant." *Id.*

Agent Teal testified that he did not believe that there was any emergency at the Bluegrass residence. Further, Agent Teal testified that he had no "real reason" to believe that anyone was in the residence. Certainly, the officers had no information that suggested that Leek, George, or the dog was inside the residence. Moreover, Smith and Barnett had been in the residence earlier in the day; although they were afraid for their safety, there was nothing that suggested they were actually in danger. Moreover, the possibility of significant water damage in the Bluegrass residence was speculative, at best, given that Smith saw no evidence of damage when she entered the residence earlier in the day. Thus, it is clear that this case does not involve a "risk of danger to the police or others," *O'Brien*, 23 F.3d at 997, other than the danger, if any, created by the DEA agents themselves. Thus, there is nothing to suggest that Agent Henderson was faced with a danger that he could not address after obtaining a warrant. *See Johnson*, 22 F.3d at 680.

Moreover, it is clear that securing a warrant in this case would not have presented any significant problem. At oral argument, the Government conceded that there were alternatives available to the agents and that they did not need to enter the Bluegrass residence without a warrant. In fact, the attorney for the Government represented that, had the agents secured the residence and called him, he would have obtained a warrant for them in short order. The availability of alternatives demonstrates that the immediacy required by our "exigent circumstances" jurisprudence was not present here. *Cf. Olsen*, 495 U.S. at 100 (holding exigent circumstances did not justify warrantless entry into apartment where robbery suspect was known to be holed up because the police had surrounded the apartment, there was no suggestion of danger to those inside with him, and "it was evident the

suspect was going nowhere if he came out of the house [as] he would have been promptly apprehended"). Agent Henderson never even attempted to set in motion the chain of events suggested by the Government attorney at oral argument.

After Agent Henderson completed the warrantless entry into the Bluegrass residence, the agents established surveillance of the residence before seeking and securing a warrant. George and Leek did not return to the residence in the interim. However, if they had returned, the agents could have impounded the residence and prohibited George and Leek from entering until the necessary warrants were secured. *See Illinois v. McArthur*, 531 U.S. 326, 331 (2001) (holding that police impoundment of residence that restrained defendant from entering until warrant could be obtained was proper). We find it clear, based, in particular, upon the Government's concession at oral argument that alternative courses of action were available to the officers, that no "real immediate and serious consequences" would "certainly occur" by the failure to enter the Bluegrass residence.

Nevertheless, the district court, relying on this Court's decision in *Rohrig*, concluded that exigent circumstances existed. In *Rohrig*, a divided panel of this Court held that a warrantless entry into a private home was justified under the "exigent circumstances" exception to the warrant requirement by the need to quell a loud noise emanating from a private home that bothered neighbors late at night. 98 F.3d at 1522. In *Rohrig*, local police officers responded to a complaint that loud noise was coming from the residence after 1:30 in the morning. *Id.* at 1509. While a cadre of angry, "pajama-clad" neighbors looked on, the officers walked around the home, knocking on the front door and first-floor windows. *Id.* Through a window, the officers observed speakers on the first floor and speaker wires on the outside of the residence. *Id.* Because the back door was unlocked and open, although there was a closed screen door, the officers entered through the rear

of the house. Continuing to announce their presence, the officers walked into the kitchen, around the first floor, into the basement, where they discovered marijuana growing, and, finally, to the second floor where they discovered the stereo as well as the defendant, who was passed out on the floor. *Id.*

The *Rohrig* Court concluded that "none of the traditionally recognized exigent circumstances [wa]s squarely presented under the facts of th[at] case." *Id.* at 1519. Instead, the *Rohrig* Court admittedly "fashioned a new exigency that justifies warrantless entry" for "an ongoing [late night] breach of the peace" based on the following three considerations culled from the Supreme Court's Fourth Amendment jurisprudence.

[O]ur review of the precedent governing our "exigent circumstances" inquiry reveals that three considerations play key roles. First, we must ask whether the Government has demonstrated a need for immediate action that would have been defeated if the . . . police officers had taken the time to secure a warrant. Next, we must identify the governmental interest being served by the officers' entry into Defendants' home, and ask whether that interest is sufficiently important to justify a warrantless entry. Finally, we must weigh this governmental interest against Defendant's interest in maintaining the privacy of his home, and ask whether Defendant's conduct somehow diminished the reasonable expectation of privacy he would normally enjoy.

*Id.* at 1518. At the time, this approach was unprecedented in this circuit.

The *Rohrig* Court explained its decision as "fact-specific," suggesting that the decision should not have broad application to significantly different fact patterns. Specifically, the Court stated:

We wish to emphasize the fact-specific nature of [our] holding. By this decision, we do not mean to fashion a broad "nuisance abatement" exception to the general rule that warrantless entries into private homes are presumptively unreasonable. We simply find that, in some cases, it would serve no Fourth Amendment purpose to require that the police obtain a warrant before taking reasonable steps to abate an immediate, ongoing, and highly objectionable nuisance, and we conclude that this is just such a case.

*Id.* at 1525 n.11. This statement makes clear that the *Rohrig* Court did not intend for its decision to have broad applicability. Thus, because we find the present case materially distinguishable from *Rohrig* and because we adhere to that panel's suggestion that its decision should not be extended beyond the facts of that case, we find that *Rohrig* is not controlling here.

*Rohrig* involved an "immediate, ongoing, and highly objectionable nuisance," while this case involves no nuisance at all. The possible water leak in this case posed no threat or nuisance to any member of the public. Rather, the agents in this case were concerned with protecting one woman while she abated potential damage to her carpet. Despite Smith's speculative concerns, there is no immediacy in this case.

Moreover, in *Rohrig*, time was "of the essence." *Id.* at 1521. There, the officers were confronted with a loud noise, which could be heard from a block away. Unable to sleep, angry neighbors sought the immediate assistance of the police. Were the officers to seek a warrant, the noise would have "continued unabated for a significant period of time." *Id.* In contrast, in this case, time was hardly of the essence in abating the possible water leak. The agents in this case were not called to the Bluegrass residence in the middle of the night by frantic neighbors. Rather, as noted previously, Smith and Barnett made an appointment to meet with them

concerning the possible water leak and their suspicion of drug activity.

The *Rohrig* Court concluded that there was a compelling governmental interest involved there because the police officers were performing a "community caretaking function" when they sought to abate the nuisance. Acknowledging that looking to the severity of the offense committed, as the Supreme Court did in *Welsh*, suggests that no vital government interest was served by the warrantless entry to quell a disturbing noise, the *Rohrig* court concluded that, "the *Welsh* analysis has less relevance as one moves away from traditional law enforcement functions and toward what the Supreme Court has referred to as 'community caretaking functions.'" *Rohrig*, 98 F.3d at 1521. *Rohrig* focused, however, on the fact that the officers in that case had only a limited purpose—abating the nuisance—and were not "questioning a subject or searching for evidence of a suspected offense." *Id.*

Here, the agents' motives in entering were arguably not as pure. The agents testified that Agent Henderson entered the apartment in his capacity as a member of the local Sheriff's Department and not as a federal agent. However, the agents in this case were called to the Bluegrass residence in their capacity as DEA agents. Smith and Barnett had explained over the telephone that they suspected drug activity in the house and described the smell and leaves in the residence. The officers too suspected drug activity prior to the entry. Thus, although the officers ostensibly entered the home to assist Smith, they were also suspicious, if not convinced, that drug-related activity was taking place inside the residence before they entered without a warrant. Unlike the entry in *Rohrig*, the entry in this case cannot be said to have been solely related to Agent Henderson's "community caretaking function." Thus, even if we apply *Rohrig*'s conclusion that the warrant requirement is implicated to a "lesser degree" when police officers act in their roles as community

caretakers, *id.* at 1523, it is not clear that the officers were acting solely in this capacity here. The community caretaking function of the police cannot apply where, as here, there is significant suspicion of criminal activity. As the Supreme Court has explained, the community caretaking function of the police applies only to actions that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *See Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). Additionally, despite references to the doctrine in *Rohrig*, we doubt that community caretaking will generally justify warrantless entries into private homes.

*Rohrig* relied on cases in which a lower federal court and a state supreme court each concluded that water leaking into apartments below sufficiently threatened the safety of the inhabitants of neighboring apartments to justify a warrantless intrusion. *Id.* at 1520 (citing *United States v. Boyd*, 407 F. Supp. 693, 694 (S.D.N.Y. 1976) and *State v. Dube*, 665 A.2d 338, 399 (Me. 1995)). This case, however, is distinguishable from those situations where the police are informed that there is definitely a water leak and that it is threatening to damage not only the apartment where the leak might be found, but also is threatening to harm the apartment – and, importantly, the neighbors – below. Unlike the situations in *Rohrig*, *Boyd*, and *Dube* where the problem the police sought to address was certain, the possible water leak in this case was only speculative. Moreover, the danger, if any, in this case was to the carpet in the Bluegrass residence only. There was no potential for another residence to be damaged or for other people to be disturbed by the possible water leak at the Bluegrass residence. As the district court concluded, protecting Defendants' interest in maintaining the privacy of the Bluegrass residence would not diminish their neighbors' interest in maintaining the privacy of their own houses as was the case in *Rohrig*, as well as in *Boyd*, and *Dube*. *See Rohrig*, 98 F.3d at 1522; *Boyd*, 407 F. Supp. at 694; *Dube*, 665 A.2d at 399.

The Government contends that Defendants had a diminished interest in maintaining the privacy of the Bluegrass residence because they were not using it as their primary residence. Generally, as noted above, the home is sacrosanct. *See Payton*, 445 U.S. at 585. Although it appears that Defendants were not using the Bluegrass residence as their primary abode, we decline to address whether the Bluegrass residence was entitled to a lesser degree of Fourth Amendment protection than a traditional residence because we find that Defendants maintained some significant and legitimate privacy interest in the Bluegrass residence and, under the circumstances of this case, the warrantless entry at issue would not be justified under even the most basic of Fourth Amendment protections.

The Supreme Court has emphatically held that the Fourth Amendment protects "'the sanctity of a man's home and the privacies of life'" from unreasonable government invasions. *Payton*, 445 U.S. at 585 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). Every citizen has a fundamental right to the protections guaranteed by the Fourth Amendment. Here, experienced government agents committed an egregious violation of the Fourth Amendment when they failed to obtain a warrant prior to entering the Bluegrass residence. The agents knew that there was absolutely no exigency, and they clearly could have obtained a warrant. What occurred in the circumstances of this case is precisely what the Fourth Amendment seeks to avoid. We find it clear that the entry into the Bluegrass residence was not justified by exigent circumstances. Thus, unless this entry was permissible under the private search doctrine as the Government argues, the government clearly violated the Fourth Amendment when it conducted a warrantless entry into the Bluegrass residence.

**2. Private Search**

Alternatively, the Government argues that the warrantless entry was justified as a private search that caused no more of

an infringement on Defendants' privacy than did the earlier search by Smith and Barnett. Defendants counter that the private search doctrine does not apply to residences under this Court's decision in *United States v. Allen*, 106 F.3d 695 (6th Cir. 1997).

Although Tennessee law probably did not permit Smith and Barnett to enter the Bluegrass residence,[2] Defendants' Fourth Amendment rights were not infringed when they did so on October 22, 1999. The Fourth Amendment is "wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *See United States v. Jacobsen*, 466 U.S. 109, 114-15 (1984) (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)).

In *Jacobsen*, the Supreme Court held that a private search followed by a Government search may be appropriate under certain circumstances. *Id.* at 121. That case involved a package damaged during shipping by a private shipping company, opened by employees of that company, and found to contain a cocaine-like substance. The Supreme Court held that no Fourth Amendment violation occurred when the company summoned law enforcement officials, who then re-traced the private search. *Id.* The Court held that "additional invasions of . . . privacy by [a] government agent [following

---

[2]The Bluegrass residence lease did not contain any provision permitting Smith, as landlord, to enter the residence at will. Tennessee law permits a landlord to "enter [a] dwelling unit without consent of the tenant in case of emergency," which is defined as "a sudden, generally unexpected occurrence or set of circumstances demanding immediate action." TENN. CODE ANN. § 66-28-403(b). Just as we conclude that the possible water leak at issue here cannot constitute an "exigent circumstance" under the Fourth Amendment, it likewise cannot be a "sudden" circumstance "demanding immediate action" under this provision of Tennessee law.

on the heels of a private search] must be tested by the degree to which they exceeded the scope of the private search." *Id.* at 115. Thus, the Government may not exceed the scope of the private search unless it has an independent right to search. *Id.* at 121 ("The fact that . . . respondents' privacy interest in the contents of the package had been largely compromised is highly relevant to the reasonableness of the agents' conduct . . . .").

In *Allen*, a panel of this Court unequivocally stated: "[T]his Court is unwilling to extend that holding of *Jacobsen* to cases involving private searches of residences." 106 F.3d at 699. The Government makes much of the fact that the *Allen* Court failed to acknowledge dicta in this Court's earlier decision in *United States v. Clutter*, 914 F.2d 775 (6th Cir. 1990), which suggested that the private search doctrine could apply to homes. *Clutter* held that a warrantless search of a home was justified by a child's consent because that child was routinely left in exclusive control of the home that he shared with his siblings, mother, and the defendant. *Id.* at 778. In dicta, however, the Court also explained that the search was also reasonable because, after entering the home with consent, the officer merely retraced the private search and confirmed the fruits of that search. *Id.* at 779. We now conclude that the *Allen* Court was not obliged to adhere to the dicta in *Clutter* and, further, find that the *Clutter* Court's failure to make any real distinction between a federal express package and a home, which is entitled to significantly more protection, casts doubt on the alternative holding in that decision.

However, even assuming that the Bluegrass residence was not a place of abode because it "contained nothing but contraband," we must discern whether Agent Henderson's search infringed upon any constitutionally protected privacy interest of Defendants not already frustrated by Smith's private search. Because we find that the scope of the Government search necessarily exceeded the scope of the private search, we find that the private search doctrine cannot

justify Agent Henderson's search. Smith requested that Agent Henderson enter the Bluegrass residence precisely because she wanted him to complete a broader search than her search earlier in the day. Earlier, Smith had declined to go beyond the living room and kitchen of the Bluegrass residence because the residence was dark and she feared for her safety should George or Leek return. Agent Henderson retraced Smith's steps, but checked under the kitchen sink, where Smith had not looked, and then navigated the rest of the house with a flashlight, including the bedrooms, washroom, and bathrooms. Thus, we hold that the warrantless entry and search of the Bluegrass residence was not justified by the private search doctrine. Moreover, because the warrantless entry into the Bluegrass residence was not justified by exigent circumstances or any other exception to the Fourth Amendment's warrant requirement, the agents should have obtained a warrant.[3]

## B. Williams's Fourth Amendment Claims

The district court stated: "It is undisputed that if Agent Henderson's first warrantless entry of the Bluegrass residence was unconstitutional, then all subsequent evidence was obtained unlawfully because the subsequent search and arrest warrants were derived solely from evidence obtained by Agent Henderson during that entry." On appeal, the Government argues that even if the warrantless entry of the Bluegrass residence was unconstitutional, Williams lacks standing to challenge the subsequent searches and the "fruit of the poisonous tree" doctrine cannot extend to him. Williams concedes that he lacks standing to contest the

---

[3] Given our findings that Defendants' constitutional rights were violated by the warrantless entry into the Bluegrass residence on October 22, 1999, we do not have occasion to address Defendants' other challenges relating to the searches and arrests that stemmed from this warrantless arrest.

warrantless entry, but counters that the Supreme Court's decision in *Wong Sun v. United States*, 371 U.S. 471 (1963), requires suppression of all evidence obtained as a result of the information derived from the warrantless entry into the Bluegrass residence. Under the circumstances presented by this case, we agree that the "fruit of the poisonous tree" doctrine extends to the evidence against Williams.

The "exclusionary rule" requires, generally, that evidence seized during an unlawful search cannot be used as proof against the victim of the search. *Id.* at 484. This prohibition extends to evidence obtained directly from the unlawful invasion as well as that which is indirectly obtained. *Id.* The Supreme Court explained:

> [N]ot . . . all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting the establishment of the primary illegality, the evidence to which instant objection is made had been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Id.* at 487-88.

Here, the Johnson City officers were searching for George at the Meridale residence when they arrested Williams, who was present in the Meridale residence at the time. The arrest warrant for George and the knowledge of the Meridale residence was obtained solely based on information obtained during the warrantless entry. In this case, it is clear that "but for" the illegal warrantless entry of the Bluegrass residence, the agents would not have obtained evidence against Williams. Moreover, though, the entry into the Meridale residence was not "come at" "by means sufficiently distinguishable to be purged of the primary taint" associated

with the unconstitutional warrantless entry into the Bluegrass residence. There was no intervening information, inquiry, or surveillance to purge the evidence obtained at the Meridale residence of the taint associated with the illegal entry into the Bluegrass residence. Thus, we conclude that the connection between the unlawful entry and the arrest of Williams at the Meridale residence was not "so attenuated as to dissipate the taint." *Id.* at 491.

### III.  CONCLUSION

For the reasons stated above, we **REVERSE** the decision of the district court to deny Defendants' motions to suppress and **REMAND** this case for further proceedings consistent with this opinion.