NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0128n.06

No. 21-3225

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td rowspan="11"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiff-Appellee,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>PATRICK MASON, JR.,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendant-Appellant.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

**FILED**
Mar 23, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

Before: SUTTON, Chief Judge; MOORE and GILMAN, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Called to investigate two unresponsive persons in a parked car during the mid-afternoon, officers found Patrick Mason, Jr. and an associate slumped over in the vehicle. Upon opening the passenger-side door to check on the occupants' well-being, one of the officers set in motion a series of events that led to the discovery of a firearm and ammunition and to Mason's arrest. Mason now appeals the district court's denial of his motion to suppress all the evidence that emerged from the officer opening that door. Because the officer's decision was in keeping with his role as a "community caretaker," we **AFFIRM**.

## I. BACKGROUND

At around 2:40 pm on January 29, 2020, the Willoughby Hills Police Department received a call reporting that two unresponsive persons were slumped over in a vehicle parked by the pumps at a local gas station. R. 35-1 (Event Chronology at 1) (Page ID #224); R. 83 (Mot. to Suppress Hr'g at 7:14–24, 8:3–7) (Page ID #720, 721). The vehicle was not running, and a customer

believed that its occupants had been there for thirty to forty-five minutes. R. 35-1 (Event Chronology at 2–3) (Page ID #225–26).

Two officers were dispatched to the scene to respond to what appeared to be an overdose. R. 83 (Mot. to Suppress Hr'g at 7–8, 33:5–6) (Page ID #719–20, 745). Officer Anderson arrived first and parked his cruiser in front of the vehicle. *Id*. at 7:25, 17:23–25 (Page ID #719, 729). Officer Mino arrived soon after, parking his cruiser behind and off to the right side of the vehicle. *Id.* at 8:10–13, 18:4–8 (Page ID #720, 730).

When Mino arrived, Anderson was already trying to wake the occupants by knocking on the vehicle's windows and yelling for their attention. R. 83 (Mot. to Suppress Hr'g at 7–8) (Page ID #719–20); R. 32-2 (Police Rep. at 2) (Page ID #199). Approaching the vehicle, Mino noticed that the windows were fogged up, making it difficult to see inside and leading him to think that the occupants had been there for some time. R. 83 (Mot. to Suppress Hr'g at 8:22–25) (Page ID #720). Mino was unable to see any indication of illegal activity in the vehicle. *Id*. at 30:8–22 (Page ID #742). What Mino saw instead was a female slumped to the right in the driver's seat, and another occupant slumped to the left in the passenger seat. *Id*. at 9:24–25 (Page ID #721). Neither was moving. *Id.* The passenger turned out to be Mason. R. 32-2 (Police Rep. at 1) (Page ID #198).

The officers had some difficulty rousing the vehicle's occupants. Both officers repeatedly knocked on its windows and Mino, who was standing on the passenger-side, yelled into the car, but to no avail. R. 83 (Mot. to Suppress Hr'g at 9:4) (Page ID #721); R. 38 (Dashcam Video at 3:40–50, 4:25–40). The occupants' unresponsiveness led Mino to conclude that they "had overdosed or were unconscious on something." R. 83 (Mot. to Suppress Hr'g at 9:14–15) (Page

2

ID #721). Believing that he and Anderson would need "to render aid," Mino retrieved a baton from his cruiser to break one of the vehicle's windows. *Id*. at 9:1–3, 15.

This proved to be unnecessary. After Mino collected his baton, he and Anderson were able to wake the driver. *Id*. at 9:4–10. She remained relatively unresponsive and incoherent, however, and as the officers asked her to unlock the doors, she repeatedly hit the lock button. *Id*. Eventually, she did unlock the doors, at which point Mino opened the passenger-side door. *Id*.

Inside the vehicle, Mason sat slumped over as he had been when Mino first arrived. *Id*. at 10:4–7 (Page ID #722). Mason was breathing but unresponsive when Mino spoke to him. *Id.* This led Mino to administer a sternum rub on Mason to try to wake him. *Id*. at 10:14–15. The rub failed: Mason awoke only momentarily before quickly passing out again. *Id*.; R. 38 (Dashcam Video at 5:30–35).

Mino also observed other features of the vehicle that he had not noticed before opening the door. The interior smelled strongly of alcohol and there was an open bottle of gin on the center console. R. 83 (Mot. to Suppress Hr'g at 10:7–24) (Page ID #722). There was ammunition visible on the car's floorboard. *Id.* at 10:10–13. And there was a black holster under Mason's hands, which Mino later testified to be "a red flag . . . that there was possibly going to be a firearm in the vehicle." *Id*. at 10:8–10.

The prediction was correct. When the sternum rub failed to wake Mason, Mino decided to remove Mason from the car. *Id*. at 11:1–3 (Page ID #723). Paramedics had since arrived on the scene, and they helped Mino extract Mason. R. 38 (Dashcam Video at 5:40–50). As Mino and the paramedics did so, a firearm fell from Mason's pants. R. 83 (Mot. to Suppress Hr'g at 11:3–6) (Page ID #723). Mino secured the weapon and ran Mason's license, which resulted in Mino

discovering that Mason had outstanding arrest warrants. R. 83 (Mot. to Suppress Hr'g at 12:1–9) (Page ID #724). Because both Mason and the driver were arrested, the vehicle was towed. *Id*. at 12:10–22. An inventory search later uncovered a loaded thirty-round magazine, an ammunition box with additional ammunition, the loose ammunition that Mino had already observed on the floorboard, and the open bottle of gin from the center console. *Id*. at 13: 5–11 (Page ID #725). Mason was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and with possession of a firearm by a person with a prior misdemeanor domestic-violence conviction, in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(2). R. 20 (Indictment) (Page ID #61–62).

Mason moved to suppress all the evidence obtained from the search of the vehicle. R. 35 (Mot. to Suppress) (Page ID #215–23). After holding a suppression hearing, the district court denied the motion, ruling that Mino's warrantless opening of the passenger-side car door was justified as undertaken in the performance of a community-caretaking function. R. 43 (10/20/2020 Dist. Ct. Order at 8) (Page ID #273). Although the encounter took on an investigatory nature once Mino opened the door, the district court found that the signs of illegal conduct were within plain view by then. *Id*. at 10 (Page ID #275).

Mason subsequently pleaded guilty to the second count, but soon moved to withdraw this plea. R. 48 (Plea Agreement at 2) (Page ID #292); R. 56 (Mot. to Withdraw Plea) (Page ID #379). The district court denied this motion and sentenced Mason to a fifty-eight-month term of imprisonment. R. 65 (3/4/2021 Dist. Ct. Order) (Page ID #474–90); R. 67 (J. at 2) (Page ID #527). Mason timely appealed, raising a host of issues, but pursuing only one: whether the district court

erred in denying his motion to suppress. R. 71 (Notice of Appeal) (Page ID #544); Appellant's Br. at 14. We turn to that issue now.

## II. ANALYSIS

On appeal, Mason does not dispute that once Mino opened the passenger-side door, evidence of illegal conduct was in plain view. Instead, he argues that Mino's initial decision to open the car door was investigative in nature and, thus, that the evidence obtained from the search should have been suppressed. "When reviewing a district court's decision to deny a motion to suppress, we review the district court's legal conclusions *de novo* and disturb its factual findings only if they are clearly erroneous." *United States v. Williams*, 354 F.3d 497, 502 (6th Cir. 2003).

For many encounters with the police, the Fourth Amendment's protection of the right of people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" provides the governing legal framework. U.S. Const. amend IV. Generally, this means that officers must obtain a warrant before they conduct a search. *See Cady v. Dombrowski*, 413 U.S. 433, 439 (1973). A partial exception to this rule occurs when officers are fulfilling their roles as community caretakers. *Id*. at 441–42.

Cognizant of the different roles that law-enforcement agents play in society, the community-caretaker exception allows officers to perform certain tasks that are not "traditional law-enforcement functions" without a warrant. *Taylor v. City of Saginaw*, 922 F.3d 328, 335 (6th Cir. 2019) (quoting *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008)). "We have found sufficient evidence to justify a caretaking search in cases where the police have been called to the scene of some sort of disturbance or have themselves witnessed persons putting themselves or

others in danger." *Dahl v. Kilgore*, No. 20-6392, 2021 WL 3929226, at \*6 (6th Cir. Sept. 2, 2021) (collecting cases).

The exception, however, is "narrow." *Taylor*, 922 F.3d at 335. An officer's actions must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" to qualify as "caretaking." *Williams*, 354 F.3d at 508 (quoting *Cady*, 413 U.S. at 441). Time must also be of the essence. If delay is not "reasonably likely to result in injury or ongoing harm to the community at large," then the police must get a warrant rather than rely on the exception. *United States v. Washington*, 573 F.3d 279, 289 (6th Cir. 2009). Finally, location matters. Performance of community-caretaking functions may excuse the search of a car, but it is going too far to take this task into a home. *Caniglia v. Strom*, 141 S. Ct. 1596, 1599–1600 (2021).

The officers' conduct up to and including Officer Mino's decision to open the car's passenger-side door fits within their role as community caretakers. As Mino testified at the suppression hearing, Mino believed that he and Anderson were responding to a possible overdose and that they would need to render aid. R. 83 (Mot. to Suppress Hr'g at 9:1–15, 33:5–6) (Page ID #721, 745); R. 43 (10/20/2020 Dist. Ct. Order at 7) (Page ID #272). At the scene, Mino's belief appeared to be reasonable as neither he nor Anderson could get the vehicle's occupants to stir, despite it being the middle of the afternoon and the officers banging on the windows and yelling at the occupants. *See, e.g.*, R. 83 (Mot. to Suppress Hr'g at 9:4) (Page ID #721). Sometime between Mino's opening the door and his administering the ineffective sternum rub, the situation may have become investigatory in nature. *See Williams*, 354 F.3d at 508 ("The community

caretaking function of the police cannot apply where . . . there is significant suspicion of criminal activity."). Yet by this time, the evidence of illegal conduct was already in plain view.

Although Mason argues that the officers should have asked the driver what was wrong with Mason before opening the passenger-side door, "the community-caretaking exception is not limited to the least intrusive means of protecting the public." *United States v. Lewis*, 869 F.3d 460, 464 (6th Cir. 2017) (quoting *United States v. Johnson*, 410 F.3d 137, 146 (4th Cir. 2005)). Furthermore, the driver was initially unresponsive and incoherent when awake, while Mason remained simply unresponsive throughout the banging, the yelling, and the opening of the door next to which he was sitting. Because Mino had been called to respond to a possible overdose, it was reasonable for him to focus on checking Mason, who appeared to be in greater need of attention.

In all this, the facts of Mason's case parallel those of *Lewis*. After responding to a call concerning a woman who was intoxicated in a store, the officers in that case learned that the woman's boyfriend, Lewis, was outside in his truck. *Id*. at 461. Officers went to talk to Lewis to secure the woman a ride home. *Id*. At the truck, one officer noticed that Lewis was asleep on the vehicle's passenger side, leading the officer to open that side's door. *Id.* Lewis awoke with a start and threw a baggie containing illegal drugs onto the truck's back floor. *Id*. at 461–62. Officers arrested Lewis based on drug possession and we upheld the district court's denial of his motion to suppress the evidence seized from the truck based on the community-caretaker exception. *Id*. at 462–63.

Admittedly, the comparison to *Lewis* is not perfect. In *Lewis*, the officers were concerned about a third-party's well-being, not the defendant's welfare. And the officers in *Lewis* neither

knocked on the vehicle nor announced their presence, opting to grab the door and open it instead. *Id.* at 464. But these differences do not help Mason. If anything, Mino's belief that Mason might have overdosed, combined with the fact that Mason remained unresponsive amid the din outside his door, arguably makes this a more compelling case for applying the community-caretaker exception. *See United States v. Greene*, No. 20-6316, 2021 WL 3199239, at *3 (6th Cir. July 29, 2021).

Against this conclusion, Mason argues that Anderson's decision to park his cruiser in front of the vehicle made this encounter an investigatory detention from the start. Specifically, Mason reasons that Anderson's "activity was intended to prevent the vehicle from leaving." Appellant Br. at 18. Consequently, Mason maintains, the community-caretaker exception does not apply, and the fruits of the search should be excluded. We are unpersuaded.

Although it is true that blocking a car to "maintain the status quo" while determining its occupants' identities can constitute a warrantless *Terry* seizure, *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009), our previous cases applying this principle involve police encounters that were investigatory in nature. In *See*, for example, the government did not even raise the community-caretaker exception. That was sensible: the officer there had been patrolling a parking lot on alert for possible robberies when, spotting a suspicious-looking vehicle, the officer parked his cruiser in order to block the occupants from driving away while he checked the license plates. *Id.* at 311–12.

In another case, *United States v. Gross*, 662 F.3d 393 (6th Cir. 2011), the government did invoke the community-caretaker exception to justify an officer who, while out on patrol, blocked a car with his cruiser to investigate it further. We rejected the government's argument, however.

*Id.* at 400–01. This, too, was sensible. Nothing about the situation in *Gross* before the officer blocked that vehicle's exit could have reasonably led to the conclusion that community-caretaking was necessary. Rather, all the government could muster to support its position was that the hour was late, the vehicle was running, the driver was absent, and, after the officer parked behind and shined his lights into the vehicle, the passenger sat up and then slumped down. *Id.* at 396–97, 400.

The current case presents facts that are distinct from both *See* and *Gross*. Unlike either of those cases, Anderson and Mino were called to the gas station to respond to a possible overdose. R. 83 (Mot. to Suppress Hr'g at 33:5–6) (Page ID #745). At the scene, Mason and the driver were alternatively unresponsive and incoherent. *See, e.g., id.* at 9:4–25 (Page ID #721). Finally, Mino did not even seek to identify Mason until after paramedics were already tending to him and the evidence at issue was in plain view. *Id.* at 12:1–9 (Page ID #724). In sum, Mason has not established that the district court clearly erred in finding that Mino's "sole purpose" in opening the passenger-side door was to fulfill a community-caretaker function. *Lewis*, 869 F.3d at 463.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Mason's motion to suppress.

9