[Cite as *State v. Archer*, 197 Ohio App.3d 570, 2011Ohio-5471.]

STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| THE STATE OF OHIO, | ) | |
| | ) | CASE NO. 10 BE 10 |
| APPELLEE, | ) | |
| | ) | |
| - v. - | ) | OPINION |
| | ) | |
| ARCHER, | ) | |
| | ) | |
| APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from Common Pleas Court, Case No. 09 CR 080.

JUDGMENT:     Reversed and Remanded. Conviction Vacated.

APPEARANCES:
Chris Berhalter, Belmont County
Prosecuting Attorney, and
Helen Yonak,
Assistant Prosecuting Attorney,
for appellee.

Damian Billak and
Rhys Cartwright-Jones,
for appellant.

JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

Dated: September 29, 2011

**DeGenaro**, Judge.

{¶ 1} Defendant-appellant, Taylor James Archer IV, appeals the decision of the Belmont County Court of Common Pleas denying his motion to suppress evidence seized from a storage unit on February 7, 2009. On appeal, Archer argues that the police violated his Fourth Amendment rights when they seized evidence without a warrant. Archer's assignment of error is meritorious.

{¶ 2} The unlawful actions of private individuals in conducting illegal searches and seizures are not subject to constitutional protection. However, when a warrantless search is not exclusively a private undertaking but involves some degree of police participation, courts must look to the facts surrounding the search in order to determine whether it is an unreasonable police search or an excepted private search. Although the deputy's presence was proper as he was initially observing a private search, because private and police conduct became so entangled, the search lost its private nature and thus was subject to Fourth Amendment protection. Although the deputy had probable cause to search the unit pursuant to the plain-smell doctrine, there were no exigent circumstances justifying a further warrantless search of

Archer's storage unit. Thus, the trial court erred in denying Archer's motion to suppress.

**Facts and Procedural History**

{¶ 3} On April 1, 2009, Archer was indicted on one count of possession of drugs, R.C. 2925.11(A) and (C)(3)(c), a third-degree felony, with an R.C. 2925.42 forfeiture specification. The charges stemmed from the search and seizure of $27,000 in cash and several bricks of marijuana from a storage space Archer rented. On May 11, 2009, Archer filed a motion to suppress the evidence seized, which was denied. Archer entered a plea of no contest on February 19, 2010, and the trial court sentenced him on March 19, 2010, to 12 months of incarceration and five years of community control. The record consists of the exhibits and testimony of Carma and Aubrey Nolan and Deputy Showalter from the suppression hearing.

{¶ 4} On February 6, 2009, Archer went to I-70 Self-Storage in St. Clairsville, Ohio, to rent a small storage space. Carma, an employee and the mother of the facility's owner, assisted Archer. Carma testified that she found Archer weird or odd and that Archer spoke at length about break-ins that had occurred at another storage facility, and because he was afraid his things would be stolen, he wanted to rent a space at Nolan's facility. Carma also testified

that she mistakenly listed Archer's name on the lease form as "James Taylor" and that she discovered the mistake after examining his driver's license, which contained Archer's correct name. Archer started to say something but then said it was fine, and signed the lease "Taylor Archer." Later that day Carma talked to the owner of the storage facility, her son, Aubrey, who was out of state. During this conversation, Carma told Aubrey about her encounter with Archer.

{¶ 5} The next day Carma performed a drive-through of the units and found that six of the storage units were missing locks. Seeing what she considered evidence of a break-in, Carma called Aubrey to discuss the situation. Aubrey advised Carma to first call the people who rented the six units and then call the sheriff to report the break-in, as well as to ask for assistance and to observe her cutting off the lock from Archer's unit "and make sure none of this stuff that could have been taken from these other units is in his unit."

{¶ 6} Carma testified that she called the sheriff and was pulling the files for the six units to call the owners when the deputy arrived but did not contact the owners until after Archer's unit had been opened and the drug task force left. When she discovered the broken

locks on the six units, she did not go in them, and she had put locks on them right away before the deputy arrived. At the time Archer's unit was opened, she had no idea what had been in the six units or whether anything was in fact missing.

{¶ 7} The deputy was dispatched to the scene. Carma told the deputy about the suspected break-ins and Archer's behavior the day before. Carma then asked the deputy to accompany her as she opened, searched, and inventoried Archer's storage space. The deputy verified that Carma was acting on behalf of the owner and had authority to cut the lock. Carma had another employee cut the lock on Archer's unit and then asked him to grab a pen and paper so she could conduct the inventory search and document the contents of the space. The deputy then volunteered the use of his camera to inventory the contents digitally rather than by a written list. Carma accepted the deputy's offer and proceeded to search the storage space as the deputy took pictures of its contents.

{¶ 8} There is conflicting evidence regarding how the search proceeded. Carma testified as follows:

{¶ 9} "A. When we were taking inventory of the boxes, one of the boxes was a small

thing. We opened it up to take an inventory what was in it, and it was full of money. How much, I couldn't tell you.

{¶ 10} "Q. You didn't take the money out or touch it?

{¶ 11} "A. No.

{¶ 12} "Q. Okay.

{¶ 13} "A. And then there was another box, about that big [indicating], that said some kind of exercise equipment on it. And when we looked in that box, it was full of—must have been vacuum packed. I got Seal-a-Meal and it looked like that."

{¶ 14} The deputy testified that the unit smelled like marijuana. He saw Carma open a shoebox, which contained money, and then saw her open a second box, which contained four large vacuum-packed bricks of what appeared, and was later determined, to be marijuana. The deputy also testified that he picked up one of the bricks, turned it over, and saw that it had been cut, and that it definitely smelled like marijuana. However, in the deputy's incident report, admitted into evidence he stated: "I was taking pictures for the owner as they were going to take an inventory. I move one box for an exercise machine and it had a smell of S/69. I then

opened the box lid and found bricks of S/69 and two other boxes that had large amounts of money.  Supervisor was called to the scene and I also had the owner step out of the unit and took over the unit for the Sheriff's Office and drug task force."

{¶ 15} Aubrey testified that he told Carma how to respond to the suspected break-in based upon his conversation with Carma the day before about Archer's behavior.  Aubrey believed that he had a right to enter Archer's unit and instructed Carma to do so pursuant to  the storage-facility lease agreement, which stated: "Tenant grants landlord * * * access to the storage space whenever proper document presents in an emergency.  Landlord, Landlord's Agents or Representatives of Governmental Authority shall have the right to enter premises, to comply with applicable law or enforce Landlord's rights."  Both Aubrey and Carma testified that they believed that the situation constituted an emergency.

## Private Versus State Search

{¶ 16} Archer's sole assignment of error asserts:

{¶ 17} "The trial court erred when it overruled Taylor Archer's motion to suppress in violation of the Fourth Amendment to the United States Constitution and Article I, Section 14

of the Ohio Constitution."

**{¶ 18}** Archer asserts that the sheriff's department violated his Fourth Amendment rights when it searched his storage unit because the deputy lacked probable cause, conducted a warrantless search, and no exception to the warrant requirement applied. The state counters that a private individual, not the deputy, conducted the search and therefore the Fourth Amendment probable-cause and warrant requirements do not apply. The state also argues that once the deputy saw the contraband he was not required to get a warrant to seize the material, as the plain-view exception to the warrant requirement applied.

**{¶ 19}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. McNamara* (1997), 124 Ohio App.3d 706, 707 N.E.2d 539. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Burnside* (2003), 100 Ohio St.3d 152, 155, 797 N.E.2d 71. Accepting these facts as true, the

appellate court conducts a de novo review of the trial court's application of the law to the facts of the case. Id.

{¶ 20} Generally, unlawful searches and seizures conducted by private individuals are outside constitutional protection because the Fourth Amendment protects individuals from state action, not a private action. *State v. Morris* (1975), 42 Ohio St.2d 307, 316, 329 N.E.2d 85. "The mere fact that evidence found and obtained during a search by a private person is ultimately turned over to the police does not destroy the private nature of the search and render it official government action subject to the exclusionary rule." *State v. Ellis*, 2d Dist. No.05CA78, 2006-Ohio-1588, at ¶ 14.

{¶ 21} But when the police become involved in a private individual's search, the probable-cause and warrant requirements of the Fourth Amendment may apply; thus the courts must look to the level of police involvement to determine whether it was a private search or an unreasonable police search. *Morris* at 316. *State v. Willis*, 169 Ohio App.3d 364, 2006-Ohio-5754, 862 N.E.2d 906, at ¶ 28. "Official participation in the planning or implementation of a private person's efforts to secure evidence may taint the operation sufficiently as to require

suppression of the evidence. The test of government participation is whether under all the circumstances the private individual must be regarded as an agent or instrument of the state. [*State v.*] *Dillon* [(Jan. 23, 1991), Miami App. No. 90-CA-07]; Katz, Ohio Arrest, Search and Seizure (2005), Section 27:12 at p. 604." *Ellis* at ¶ 14. Although the state usually bears the burden of proving that an exception to the warrant requirement exists when a warrantless search has occurred, the defendant bears the burden of proving that there was "sufficient governmental involvement in seemingly private conduct" to consider it a state search. *State v. Jedd* (2001), 146 Ohio App.3d 167, 171,–172, 765 N.E.2d 880.

{¶ 22} When determining whether the search was state or private action, courts "have paid particular attention to whether or not the search in question was initiated by a private person and for private purposes." *Willis*, ¶ 30; *State v. Dillon* (Jan. 23, 1991), 2d Dist. No. 90-CA-07; *State v. Knapp* (July 11, 2001), 9th Dist. No. 00CA0073. Further, it is not enough that the police are present; "[t]here must be some evidence that police directed private persons where and how to search and what to look for." *Ellis*, 2006-Ohio-1588, at ¶ 16. In other words, there must be "a great deal of entanglement" between the conduct of the private individual and

the police before the search can be considered state action. *State v. Cook* (2002), 149 Ohio App.3d 442, 446, 777 N.E.2d 882.

{¶ 23} In *Morris*, 42 Ohio St.2d 307, 329 N.E.2d 85, a suspicious person checked a bag at the baggage room of a railroad terminal, and even though the room was designed for temporary storage, the bag was left there for days. Railroad employees examined the bag, became more suspicious, and contacted the police. The employees believed they had the right to open the bag to protect the company, even though it was not company policy to open bags. The next day the police cut the lock and an employee opened the suitcase and discovered a number of cellophane bags containing white powder. The police, upon discovering what they thought were narcotics, ordered a field test and subsequently seized the contraband. The Ohio Supreme Court upheld the search, concluding that the police were not significantly involved in the search to implicate Morris's Fourth Amendment rights, and that if "the minimal police participation which did occur was done for purposes of protection of the public safety and not with the intent of gathering evidence to be used in a criminal prosecution or otherwise evading constitutional protections, then the search is a private undertaking for purposes of the Fourth

Amendment to the United States Constitution, and contraband evidence, thereby coming within the 'plain view' of police officers having a legitimate right to be present, is not subject to exclusion at trial under the Fourth Amendment." *Morris*, paragraph two of the syllabus.

{¶ 24} Some of the circumstances here are similar to *Morris*. Carma and Aubrey, independent of the police, suspected that Archer could have been responsible for the suspected break-in and decided to search his storage unit to see if it contained stolen goods, believing they had the authority to do so pursuant to the emergency clause in the lease agreement. Carma asked the deputy to witness the lock being cut off and the inventory search. Whether or not Carma had actual authority to search Archer's unit is not determinative, because even an unlawful search by a private individual falls outside the scope of the Fourth Amendment. *Morris* at 316. Thus, the deputy's presence at Carma's request to observe her opening the unit and taking an inventory was lawful pursuant to *Morris* (fulfilling a public-safety duty) and *Knapp* (facilitating the owner's inspection of his or her property). However, the conduct of Carma and the deputy became entangled to the extent warned against in *Cook*.

{¶ 25} The initial extent of the deputy's involvement was taking pictures of the items

as Carma searched through Archer's unit. Thereafter, the deputy's involvement in the search of Archer's unit escalated. The deputy testified that when he entered the storage unit, it smelled like marijuana. In her testimony, Carma stated that "we" opened a box, whereas the deputy testified that he saw Carma open the shoebox, which contained money, and then saw her open a second box, which contained the marijuana. The deputy admitted in his testimony that he picked up one of the bricks, turned it over, saw that it had been cut, and determined that it smelled like marijuana. Significantly, the deputy's incident report states that he moved a box, and because it smelled like marijuana, he opened the box lid and found the marijuana bricks and two other boxes that had large amounts of money. This does not constitute minimal police involvement contemplated by *Morris* and its progeny that would support the trial court's conclusion that this was a private search. Although the search initially was private in nature, it evolved into state action subject to Fourth Amendment scrutiny. *Morris; Cook.* But our analysis does not end here. We must now determine whether the state had probable cause for a search and whether there is an exception to the warrant requirement.

{¶ 26} The deputy testified that he smelled marijuana when he entered the unit. And in

his report, he stated that when he moved a box, but before he opened it, he smelled marijuana.

"The smell of marijuana, alone, by a person qualified to recognize the odor, is sufficient to establish probable cause to conduct a search." *State v. Moore* (2000), 90 Ohio St.3d 47, 734 N.E.2d 804, syllabus. But the Supreme Court did not extend the plain-smell doctrine so far as to hold that it could support both a finding of probable cause and an exception to the warrant requirement. *Alliance v. Barbee* (Mar. 5, 2001), Stark App. No.2000 CA00218; *State v. Crenshaw,* 2008-Ohio-4859, at ¶ 19. We likewise hold that while the plain-smell doctrine is sufficient to establish probable cause, it does not permit a warrantless search. *Johnson v. United States* (1948), 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; and *Taylor v. United States* (1932), 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951; *Moore; Barbee; Crenshaw.*

**{¶ 27}** We must now determine whether an exception to the warrant requirement validates this search. Generally, to justify a warrantless search there must be "compelling reasons" or exceptional circumstances to qualify as an exigent-circumstances exception, *Moore,* 90 Ohio St. 3d at 52, citing *McDonald v. United States* (1948), 335 U.S. 451, 454, 69 S.Ct. 191, 93 L.Ed.153, or imminent danger that evidence will be lost or destroyed. *Moore at*

52, citing *Cupp v. Murphy* (1973), 412 U.S. 291, 294-296, 93 S.Ct. 2000, 36 L.Ed2d. 900.

Despite the fact that the Nolans believed it was an emergency situation, neither the exigent-circumstances exception nor the immediate danger of destruction of evidence can validate this search.

{¶ 28} In *Barbee*, the police were dispatched to the defendant's home on a complaint of pit bulls being kept improperly. Upon arriving at the residence, the officer was eventually admitted but was instructed to stay in the doorway. When the responding and backup officers smelled marijuana, they conducted a warrantless search of the home. The motion to suppress was denied. The Fifth District reversed, holding that the evidence should have been suppressed because there was no evidence of either any danger of injury or imminent risk of destruction of evidence and that the three officers could have secured the residence in order to obtain a warrant. *Barbee.*

{¶ 29} In *State v. Lomax,* 8th Dist. No. 86632, 2006-Ohio-3725, the police were dispatched to respond to a dispute between Lomax and Virginia Davis about the ownership of a garage. Unable to discern who the owner was, the police advised the parties to resolve their

dispute in civil court. As the officers were leaving, Davis gave them a bag of marijuana that she claimed Lomax was keeping in the garage. The officers approached the garage and, smelling marijuana, entered the garage, where marijuana was in plain sight. Backup was called, and the defendant's car and person were searched as well. Id. at ¶ 2-4. The defendant conceded probable cause, and the trial court suppressed the evidence because there were no exigent circumstances justifying the search of the garage. Id. at ¶ 7. The Eighth District affirmed, concluding, as in *Barbee*, that there was no indication that evidence was being or would be destroyed or any danger of impending injury to anyone, and that the officers could have secured the garage and obtained a warrant. Id. at ¶ 17.

{¶ 30} Finally, in *Crenshaw*, 2008-Ohio-4859, the Eighth District again affirmed the trial court's suppression of evidence obtained in a warrantless search that could not be justified by either warrant exception. The officers were conducting surveillance of a residence because of a complaint of drug activity at that home. After witnessing a drug transaction on the street, seven to twelve officers entered the fenced-in back yard and smelled a strong odor of marijuana. With weapons drawn, the police detained the seven to ten people in the yard, and

conducted a search of the house. Id. at ¶ 2-6. Again, the court found that the smell of marijuana did not negate the warrant requirement, id. at ¶ 17, and that there were no exigent circumstances that would have precluded the police from securing the premises and obtaining a warrant, id. at ¶ 23.

{¶ 31} In this case, there was neither an imminent risk of injury to anyone nor any danger of destruction of evidence to justify a warrantless search of Archer's unit. Archer was not present. Carma testified that a new lock could have been placed on the unit to secure it. Further the deputy could have remained on site to secure the unit until a warrant could be procured, just as he did until the drug task force arrived. In the absence of exigent circumstances, once contraband is discovered in either a police or a private search, the police must obtain a warrant to conduct a further search. *Dillon* ("The initial entry into the appellant's apartment and the resultant discovery of the marijuana was strictly the private action of Ms. Harris. * * * [U]pon discovering the marijuana and that the apartment was rented to the appellant, [the officer] immediately secured a search warrant"); *Knapp* ("The evidence demonstrates that Mrs. Kraus initiated the entry and inspection of the leased premises. We find

that DeFelice's inquiry of the leasee's identity coupled with his statement regarding the marijuana does not transform the private nature of Mrs. Kraus's search into state action. A search instigated by a private person, for private purposes does not fall within the purview of the Fourth Amendment. *Morris*, 42 Ohio St.2d at 316. Accordingly, the trial court erred in suppressing the evidence seized at the premises pursuant to the March 31, 2000 search warrant"). See also *Jedd* and *Willis.* Thus, once the deputy smelled the marijuana, preferably when he entered Archer's unit, but definitely no later than when he picked up the box, the search should have ceased. He had probable cause to search further pursuant to the plain-smell doctrine, but because of the absence of exigent circumstances, he should have secured the unit and obtained a warrant before conducting any further search of Archer's unit.

{¶ 32} The unlawful actions of private individuals in conducting illegal searches and seizures are not subject to constitutional protection. However, when a warrantless search is not exclusively a private undertaking but involves some degree of police participation, courts must look to the facts surrounding the search in order to determine whether it is an unreasonable police search or an excepted private search. Although the deputy's presence was proper as he

was initially observing a private search, because private and police conduct became so entangled, the search lost its private nature, and thus was subject to Fourth Amendment protection. Although the deputy had probable cause to search the unit pursuant to the plain-smell doctrine, there were no exigent circumstances justifying a further warrantless search of Archer's storage unit. Thus, the trial court erred in denying Archer's motion to suppress. Accordingly, Archer's motion to suppress is granted, his conviction is vacated, and the case is remanded for further proceedings.

Judgment reversed

and case remanded.

**DONOFRIO** and **VUKOVICH**, JJ., concur.