RENDERED: DECEMBER 19, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2022-SC-0541-DG

JAMES JAVONTE CRITE                                    APPELLANT

                 ON REVIEW FROM COURT OF APPEALS
V.                            NO. 2021-CA-0663
             DAVIESS CIRCUIT COURT NO. 19-CR-01077

COMMONWEALTH OF KENTUCKY                         APPELLEE

**OPINION OF THE COURT BY JUSTICE THOMPSON**

**<u>AFFIRMING</u>**

James Javonte Crite[1] appeals as a matter of right from the Daviess Circuit Court's denial of his motion to suppress evidence, as reserved in his guilty plea, from his conviction for possession of a firearm by a convicted felon, which resulted in a two-year sentence of incarceration and shock probation. Crite argues that his landlord had no right to enter his apartment because there was no emergency, and his landlord lacked any common authority to grant entry to the police officers. Accordingly, Crite argues that there was no justification for the officers to search his apartment, and the firearm they found therein must be suppressed as the product of an illegal search.

---

[1] At varying times in the record, Crite is referred to by other names, including James Jayleo Lawrence and Jayleo Lawrence Crite. At sentencing, Crite stated that he had legally changed his name to Jayleo Javonte Lawrence via a court order out of the Davis District Court; however, such court order was not made part of the record. We continue to refer to him as Crite as this was the name on his indictment and on his motion for a belated appeal.

We disagree. We conclude that the landlord and her agent the electrician had a right to enter because Crite had consented to such entry pursuant to the "emergency entry" clause of his lease. Pursuant to such consent and where Crite's presence could pose a danger to the landlord and the electrician, the landlord could reasonably ask police officers to enter to provide protection if Crite was present.

Entry by the police officers was objectively reasonable as it was needed to facilitate the landlord and her agent the electrician being able to safely effect emergency electrical repairs. The police officers properly limited their actions to ensuring the safety of the landlord and the electrician from the specific threat that Crite posed (based on the information that he was a schizophrenic who was not taking his medication, had recently acted irrationally in ripping out the electrical wiring in his apartment, there was a gun in the apartment, and he was a felon). The officers properly limited the scope of their search to ensure he was not present in the apartment rather than engaging in a broader search for investigatory purposes. The suppression of the AR-15 rifle was not required because the officers observed the rifle in plain view.

## I. FACTUAL AND LEGAL BACKGROUND

Crite lived in an apartment that he rented from Century Property Management (Century) which was part of a four-plex. Apartment Manager Beth Roberts oversaw these apartments with help from her employee Lisha Reynolds.

Under the terms of the lease, Century and Crite both had duties and responsibilities. As a tenant, Crite was obligated to "keep the dwelling unit and all parts of the Property safe[,]" and "not engage in criminal activities[.]" He was required to report to Century "any malfunction of or damage to electrical, plumbing, HVAC systems, smoke detectors, and any occurrence that may cause damage to the property."

Century agreed "to make repairs and do what is necessary to keep premises in a fit and habitable condition" and to "maintain in reasonably good and safe working condition, all electrical, gas, plumbing, sanitary, HVAC, smoke detectors . . . and other facilities supplied by [landlord]."

Pursuant to the "Right to Access" clause, the parties granted the landlord a right to enter in certain, specified circumstances. This clause provided:

> The Tenant shall not unreasonably withhold consent to the landlord to enter into the dwelling unit in order to inspect the premises; make necessary or agreed repairs . . . ; [or] supply necessary or agreed services . . . . *The Landlord or Landlord's agent may enter the dwelling unit without consent of the Tenant in case of emergency.*

(Emphasis added).

On July 9, 2019, Crite's brother, William Crite (William), called Century to inform them that Crite, who was a schizophrenic,[2] had stopped taking his

---

[2] At his sentencing hearing, Crite stated that he only suffers from post-traumatic stress disorder (PTSD). For purposes of our review, it does not matter what Crite's diagnosis is, as Century's employees reasonably relied on William's statement that Crite had schizophrenia and was off his medication. William spoke with authority as Crite's brother, and his report as to the condition of the apartment was proven accurate as observed by Reynolds. Under these circumstances, it was reasonable for Robertson to believe William's account of his brother's current condition.

medication and William was taking Crite to the hospital. William also informed Century that the apartment had no electricity or air conditioning, it was very hot inside the apartment, and there was damage to the apartment caused by wires having been pulled out from receptacles, the breaker box, and the water heater. William requested that repairs be made while Crite was in the hospital.

In response, Robertson sent Reynolds to assess the damage. Reynolds inspected the premise to look for electrical damage and observed that wires were pulled from the hot water heater and the HVAC, there was "black" around the breaker, and the temperature inside the apartment was about 100 degrees. Reynolds took photographs of the damage and saw what appeared to be a handgun on a coffee table. Reynolds reported the damage and the presence of the handgun to Robertson.

Due to the exposed wires and apparent damage to the breaker box, Robertson was concerned about the safety of the tenants in the four-plex and scheduled an electrician, Pete Goodman, to make repairs. On July 10, 2019, before going to meet the electrician, Robertson contacted the Owensboro Police Department via Central Dispatch to request officers meet her and the electrician before entering the apartment. The phone call was recorded. Robertson explained her reason for wanting officers to meet her as follows:

> There is a tenant there, apparently, I just found out he's schizophrenic, they did not admit him to the hospital last night. We have pictures that the, all the wires in the HVAC are all pulled out, the breaker box, there's no electric in the, in the apartment. I want, I've called for an electrician to come down as well, and I want to make sure the apartment is safe for the other tenants that live there. And then the reason for the officer is because I think this guy may be a felon, possibly, and that got by me because we don't

4

rent to felons and when we went down to investigate yesterday, 'cause he was supposed to be in the hospital, one of my coworkers when she went in and saw the damage, she saw a gun in there, and so if he is a felon and he's, and now I know he's schizophrenic if he's not on his medicine, you know, I don't feel safe. . . . And I don't know if he's there, I have no idea, but I know they did not admit him to the hospital.

No one from Century attempted to contact Crite or William prior to going to the apartment.

Officers Logan Nevitt and Michael Matthews were dispatched to meet Robertson and the electrician. Officer Matthews testified he was dispatched to assist the apartment manager and was there for the safety of the electrician and the property manager as there was a handgun present, Crite had mental issues, and the property manager did not feel safe going into the apartment. Both officers were aware that Crite was wanted on a *capias* warrant,[3] and Officer Matthews had knowledge that Crite was a convicted felon.

Robertson and then the officers knocked and announced their presence, but no one came to the door. Despite no one answering, Robertson still wanted the officers to accompany her and the electrician inside the apartment. Officer Nevitt testified that he and Officer Matthews "had no reason to go inside" the apartment as there were no exigent circumstances but eventually acquiesced to Robertson's request that they go in to check the safety of the apartment.

---

[3] "Capias" is Latin for "that you take" and refers to "[a]ny of various types of writs that require an officer to take a named defendant into custody" with a capias "often issued when a respondent fails to appear or when an obligor has failed to pay child support." CAPIAS, Black's Law Dictionary (12th ed. 2024).

Robertson unlocked the door with her manager's key and the officers entered first to make sure it was safe for Robertson and the electrician to enter. Officer Matthews testified they were in the apartment a very short time, just long enough to "clear" it and make sure no one was hiding inside. While "clearing" the apartment, the officers saw the supposed handgun on the coffee table and in another room noticed what appeared to be the buttstock of a rifle and a magazine sticking out from a couch. Officer Nevitt testified "it was clear to me what [the rifle] was based on my knowledge of firearms." The officers also noted there was extensive damage to the apartment, including scorch marks around the breaker box.

Once the officer determined it was safe for them to enter, Robertson and the electrician entered. Robertson observed major damage: things everywhere were torn apart, the thermostat was off the wall with wires exposed, the HVAC had a full panel pulled off with all the wires out, the TV was "disconstructed," the water heater had wires pulled out, the fuse box had a black soot-like stain coming from it (like it had sparked or exploded) and some kind of tool had been used to try to pop that off the wall, the main breaker was tripped, and everything was shut off.

The officers investigated the supposed handgun and determined it was an air pistol (a bb-gun) rather than a handgun. They retrieved the rifle and determined it was an AR-15. The AR-15 had a magazine and a round chambered. They seized it because they knew Crite was a convicted felon.

The electrician proceeded to make repairs. Before the electrician was finished and while Robertson and the police were still present outside the apartment, Crite returned to the apartment parking lot with his brother. The officers arrested Crite for being a felon in possession of a firearm and he was later indicted for this crime.

Crite filed a motion to suppress evidence of the AR-15, arguing that the officers illegally searched his apartment without any legal justification as they did not possess a warrant or have his consent, and there were no exigent circumstances or any emergency.

On August 24, 2020, the trial court conducted a hearing on Crite's motion to suppress. Robertson, Officer Nevitt, Officer Matthews, and Reynolds testified. The lease was admitted into evidence along with photographs of the damage to the apartment and the recorded call Robertson made to dispatch.

The Commonwealth argued that the landlord properly entered pursuant to the consent provided by the lease's emergency entry clause to see to the repairs with the electrician, and officers were properly allowed to enter to ensure their safety given the totality of the circumstances without violating the Fourth Amendment.

On October 8, 2020, Crite's motion to suppress the evidence was denied. The trial court concluded that it would not interpret the term "emergency" as narrowly as Crite argued (that no "emergency" was present where the breaker box was shut off, the landlord failed to immediately call 911 after seeing the condition of the apartment and evacuate the other tenants, and instead waited

7

until the next day to engage an electrician). The trial court concluded

Robertson could lawfully enter the apartment where Crite had pulled out

wiring, damaged the apartment, and had damaged the breaker box. The trial

court reasoned:

> At the hearing, there was testimony that there was quite a bit of soot at the breaker box indicating significant damage. Even if the breaker box had been shut off, it would be difficult to fully determine the damage, or the extent the damage may have affected the other units. Moreover, Century did not know when [Crite] would return, and [it] also had a need to make sure the apartment was habitable. No electricity in an apartment, especially in July, would certainly make the apartment [un]inhabitable, and it would be reasonable to think that such a situation would be an emergency that would require engaging an electrician as soon as possible.

As to the entry by the police officers, the trial court concluded their

actions were also reasonable:

> Robertson would be reasonable [in] wanting police assistance in entering the apartment. She had been made aware that [Crite] suffered schizophrenia, had been off his medication, had caused significant damage to the apartment, and there were possible weapons in the apartment. Robertson was unaware if [Crite] had been admitted to the hospital, if he was at the apartment, or if he was medicated again.
>
> The Court also finds significant that Robertson's reason for calling central dispatch was for [the] safety of herself and the electrician rather than to report a crime. Certainly, Robertson did report she believed that [Crite] was a felon and that there was a firearm, but she did not request police to arrive to investigate any crime or to arrest [Crite]. Her call was focused on personal safety.
>
> Furthermore, even [after being] notified by central dispatch that there was a capias warrant and at least one officer knowing he was a convicted felon with a possible firearm in the apartment, Officers Nevitt and Matthews were not present to locate and arrest [Crite] or to investigate a crime. Indeed, Officer Nevitt's testimony shows that the officers did not believe they had exigent circumstances to

8

enter. They only entered after [the] insistence of Robertson for her safety and the safety of the electrician.

After reviewing pertinent law, the trial court concluded that the entry by the police officers did not violate the Fourth Amendment:

> [E]ntry into the apartment was proper because of three reasons: (1) the emergency with the electrical system; (2) Robertson's reasonable safety concerns given the damage, the presence of a weapon, [Crite] having been off his medication, and [Crite's] whereabouts being unknown; and (3) that Officers Nevitt and Matthews were not at the apartment for an investigative purpose. Under the totality of the circumstances, the officers' entry to the apartment was reasonable under the Fourth Amendment. If any one of those three reasons had not been present, the court would have [found] otherwise.

(Footnote omitted). As the trial court determined the officers were legally permitted in the apartment under these circumstances, the trial court concluded they could properly identify the illegality of Crite having a visible rifle in plain view.

On February 19, 2021, Crite entered into a conditional plea deal as charged, reserving his right to appeal the denial of his motion to suppress this evidence, in exchange for a recommended sentence of two years of incarceration. The trial court sentenced Crite in accordance with this agreement. On May 3, 2021, the trial court granted Crite's motion for shock probation, and he was placed on five years of probation.

Crite filed a motion for a belated appeal which the Court of Appeals granted on August 12, 2021.

The Court of Appeals affirmed. *Crite v. Commonwealth*, 2021-CA-0663-MR, 2022 WL 16842272 (Ky. App. Nov. 10, 2022) (unpublished). As to the

9

entry by Robertson for an "emergency" under the terms of the lease, the Court reasoned:

> [W]e are convinced that, despite the fact [that] the damage [from the destruction of the apartment's electrical system] had not presently resulted in a fire, given the apparent risk of harm to both property and life arising from pulled wires and a damaged fuse box, Century's immediate access to assess and ameliorate the risk was justified.

*Id.* at *3.

As to the entry of the officers, the Court of Appeals concluded their entry did not offend the Fourth Amendment because "the officers, like the electrician, were merely facilitating Century's legitimate interest in entering Crite's apartment[.]" *Id.* at *4.

The Court of Appeals further rejected Crite's argument that the trial court erred by implicitly creating a community caretaker exception in contravention of *Caniglia v. Strom*, 593 U.S. 194, 199 (2021).

We granted discretionary review and ordered oral argument.

## II. ANALYSIS

Crite argues that his right to be free from a warrantless intrusion into his home pursuant to the Fourth Amendment and Section 10 of the Kentucky Constitution was violated when the police entered and searched his apartment. In support of this argument, he states: landlords cannot legally enter a tenant's home and give consent to the police to enter; the landlord's tenuous authority to enter was based solely on the emergency exception to the consent requirement in Crite's lease and Kentucky's Uniform Residential Landlord Tenant Act (URLTA); the landlord could not extend her limited authority to the

10

police to search because she was afraid; and exigent circumstances, emergency aid and the community caretaker exceptions to the warrant requirement were not pled or proven. Crite indicates that the facts involving this police entry is similar to that which occurred in *United States v. Williams*, 354 F.3d 497 (6th Cir. 2003), where the Court determined that a landlord could not properly bring Drug Enforcement Administration (DEA) agents along to investigate a possible water leak.

The Commonwealth counters that Robertson properly requested police assistance to address an emergency involving wiring damage where Robertson had reason to fear that if Crite was in residence that he could pose a danger to her and the electrician. The Commonwealth argues the situation is most analogous to *People v. Plane*, 274 Cal.App.2d 1 (1969), where a landlord was authorized to enter to address a potential safety issue and brought a police officer inside as a witness, what the officer saw in plain view did not need to be suppressed because the landlord and the officer were not there to investigate a crime.

"When reviewing a trial court's denial of a motion to suppress, we utilize a clear error standard of review for factual findings and a *de novo* standard of review for conclusions of law." *Jackson v. Commonwealth*, 187 S.W.3d 300, 305 (Ky. 2006). The meaning to be given to contractual terms, such as the emergency entry clause in the Century lease, is a question of law. *3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005).

There is no particular dispute about what occurred. Instead, what is disputed is whether the facts justified entry by the landlord and the police pursuant to the lease's emergency entry clause, as the Commonwealth provides no other justification for the officers' entry and search. Therefore, we focus our discussion on whether the lease provided consent for the police search.

**A. Constitutional Protections from Unreasonable Searches and Seizures**

The Fourth Amendment to the United States Constitution and Section 10 of the Kentucky Constitution, both of which grant people the right to be secure in their homes, do not provide "a guarantee against *all* searches and seizures[;]" instead, they only provide protection "against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985).

> The touchstone of our analysis under the Fourth Amendment is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). Reasonableness, of course, depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

*Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977).

"Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). If an action is objectively "reasonable," the Fourth Amendment is not offended and the individual's subjective motivation is irrelevant. *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006).

While searches and seizures inside a home without a warrant are presumptively unreasonable, consent justifies entry. *Groh v. Ramirez*, 540 U.S. 551, 564, (2004); *Payton v. New York*, 445 U.S. 573, 586 (1980); *Simpson v. Commonwealth*, 474 S.W.3d 544, 548 (Ky. 2015).

"A defendant can knowingly and voluntarily contractually agree to allow third parties to enter a space where the defendant has an expectation of privacy." *United States v. Smith*, 353 Fed. Appx. 229, 230-31 (11th Cir. 2009). *See, e.g., Salpas v. State*, 642 S.W.2d 71, 72 (Tex. App. 1982). A lease can, therefore, provide consent to entry if the terms required for such consent are met.

> However,
>
> [e]ven when a search is authorized by consent, the scope of the search is limited by the terms of its authorization. *Shamaeizadeh v. Cunigan,* 338 F.3d 535, 547 (6th Cir. 2003). "The standard for measuring the scope of . . . consent under the Fourth Amendment is that of 'objective' reasonableness . . . ." *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (internal quotations omitted).

*Guzman v. Commonwealth*, 375 S.W.3d 805, 808 (Ky. 2012).

Importantly, the Fourth Amendment's protection against unreasonable searches and seizures "proscrib[es] *only governmental action*; it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government[.]" *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (internal quotation marks and citation omitted) (emphasis added).

13

Private individuals who engage in a search based on their own interests (rather than acting at the behest of government actors) can properly disclose what they have learned as such private action does not constitute a Fourth Amendment violation. *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 614-15 (1989); *Walter v. United States*, 447 U.S. 649, 656 (1980); *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). While these individuals' actions might be unreasonable and could form the basis of a trespass action or other crime, their actions do not implicate the Fourth Amendment.

The police cannot use private individuals to get around the necessity of obtaining a warrant. If the private individual is acting as an agent of the government, then the Fourth Amendment applies. *Jacobsen*, 466 U.S. at 113. To make a determination as to "whether a private individual is acting as, or with the participation of a governmental official[,]" the relevant considerations are: "(1) whether the government had knowledge of and acquiesced in the intrusive conduct; (2) whether the citizen intended to assist law enforcement or instead acted to further his own purposes; and (3) whether the citizen acted at the government's request." *United States v. Avalos*, 984 F.3d 1306, 1307-08 (8th Cir. 2021) (quoting *United States v. Highbull*, 894 F.3d 988, 992 (8th Cir. 2018) (cleaned up).

"[T]he Fourth Amendment's ultimate touchstone is 'reasonableness[.]'" *Stuart*, 547 U.S. at 398 (2006). Therefore,

> [t]he Constitution is no more violated when officers enter without a
> warrant because they reasonably (though erroneously) believe that
> the person who has consented to their entry is a resident of the

14

premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.

*Illinois v. Rodriguez,* 497 U.S. 177, 186 (1990).

## B. Could the Landlord Lawfully Enter Pursuant to the "Emergency" Clause of the Lease?

Crite argues that neither the lease, nor URLTA, permitted the landlord's entry as no emergency existed and, therefore, he was entitled to appropriate notice before the landlord entered. Under the terms of the lease he signed, Crite knowingly and voluntarily agreed "[t]he Landlord or Landlord's agent may enter the dwelling unit in case of an emergency."

URLTA has a similar emergency entry provision, Kentucky Revised Statutes (KRS) 383.165,[4] but its requirements are irrelevant because Daviess County and Owensboro have not adopted it.[5] *See* KRS 383.500 (authorizing cities, counties, and urban-county governments to enact provisions of URLTA).

We must interpret whether, pursuant to the language of the lease, these facts justified emergency entry by Crite's landlord. Typically, contractual language can properly be given its ordinary dictionary definition. *Aetna Cas. & Sur. Co. v. Commonwealth,* 179 S.W.3d 830, 838 (Ky. 2005). However, the

---

[4] KRS 383.615(2) provides: "A landlord may enter the dwelling unit without consent of the tenant in case of emergency." KRS 383.615(3) provides that a landlord is not to abuse this right of access; therefore, "[e]xcept in case of emergency or unless it is impracticable to do so, the landlord shall give the tenant at least two (2) days' notice of his intent to enter and may enter only at reasonable times."

[5] "Under KRS 383.500, Daviess County is a non-Uniform Residential Landlord Tenant Act (non-URLTA) jurisdiction." Kentucky Rules of Daviess District Court (RDDC) 1002. A search of Owensboro ordinances has similarly established that Owensboro has not adopted it, either.

15

terms in the lease must be interpreted considering the purposes of a residential lease generally and the responsibilities of the landlord to the tenant in this particular lease. *See Sparks Milling Co. v. Powell*, 283 Ky. 669, 143 S.W.2d 75, 77 (1940); *Lewis v. Jaeger*, 818 N.W.2d 165, 183-84 (Iowa 2012). Accordingly, an "emergency" under the lease *should not* be considered synonymous with the sort of "exigent circumstances" which must be proven for police to enter without a warrant or consent (when the "emergency" clause of a lease is not the justification for entry).

Housing concerns which relate to health and safety of the named tenants and/or their neighbors or could risk serious damage to the premises are considered "emergencies" which justify entry by a landlord and the landlord's agents as such situations which must be addressed promptly. Restoration of utility services which a landlord is contractually required to provide may constitute an emergency if the problem makes such housing unlivable or unsafe for the named tenants and/or their neighbors.

We have reviewed cases regarding these issues from our sister courts. The trial court and the Court of Appeals relied on the *Plane* case and distinguished the *Williams* case, whereas Crite argues that the search of his apartment was equally problematic as the one in *Williams* and should have resulted in the suppression of the evidence against him. We first consider whether the lease at issue permitted the landlord to enter given the circumstances, before separately considering whether the landlord could admit the police within the scope of the consent provided by the lease.

16

In *Plane*, 274 Cal.App.2d at 3, the Court concluded that landlord was justified in entering the tenant's apartment under an emergency entry clause out of concern for the safety of his tenants and the building where the tenant had been unexpectedly arrested outside of his apartment, "leaving behind him burning lights, a pet and a reasonable possibility of an unattended lighted stove[.]" Other cases have similarly allowed landlords to enter pursuant to such clauses for a variety of issues relating to the condition of the property. *See United States v. Jacobs*, 31 M.J. 138, 144 (C.M.A. 1990) ("egregious 'stink'"); *Wilkinson v. Lewis*, 289 F. Supp. 3d 371, 381 (N.D.N.Y. 2018) ("a bursting pipe or fire[,]" or other situation feared to place tenants or others "in jeopardy"); *Smith*, 353 Fed. Appx. at 230-31 (storage facility, leaking water from the unit).

In contrast, the entry of the landlord was inappropriate in *Williams* where any potential damage to a building had likely already occurred; if the too-high water bill indicated a leak, it had been going on for weeks and was not an emergency. 354 F.3d at 504.

We agree with the trial court that the damage to the apartment's electrical system constituted an emergency under the terms of the lease because it caused a risk to all tenants in the four-plex and the property. Therefore, we are satisfied that the trial court properly found that both Reynolds and Robertson properly entered Crite's apartment to address this emergency. Even if the breaker was shut off, the wiring damage posed a danger to Crite and other residents of the four-plex in that the breaker could be switched on by anyone who entered the apartment and in that circumstance

17

the wiring damage posed a risk of sparking and starting a fire which could spread through the four-plex. Additionally, anyone touching damaged electrical wiring faced possible electrocution.

Furthermore, Century's duty to Crite to make the repairs needed to keep the apartment "in a fit and habitable condition" included supplying the apartment with electrical and HVAC services, and the lack of such services was also an emergency, especially considering this occurred in July, the time of year when outdoor temperatures can be extremely high. This additionally justified emergency entry to make such repairs.

It does not matter that Reynolds entered one day and Robertson entered the day after. Reynolds's entry provided Robertson with the information needed to determine what course of action was appropriate and Reynolds could not make the repairs herself. Therefore, an additional entry was appropriate to make repairs. *See Michigan v. Clifford*, 464 U.S. 287, 297 n.8 (1984) (explaining an immediate danger of a future hazard may justify further investigation without a warrant).

Robertson's private conduct in relaying Reynolds's statements to dispatch and the police about the gun Reynolds found when she entered the apartment does not implicate Fourth Amendment protections. These statements could have provided grounds for the police to apply for a warrant but could not justify entry by law enforcement for exigency. Whether the police officers could lawfully enter Crite's apartment without a warrant, rests wholly

upon whether the lease provision, which justifies the landlord's entry, can also justify their entry under the circumstances.

## C. Can a Landlord who is Authorized to Enter, then Permit Entry by the Police?

It is well established that a landlord typically cannot provide consent for entry by the police for law enforcement purposes because landlords generally lack any common authority to grant entry to admit guests to a property without the consent of the current occupant. *Georgia v. Randolph*, 547 U.S. 103, 112 (2006); *Stoner v. California.*, 376 U.S. 483, 488–90 (1964); *Chapman v. United States*, 365 U.S. 610, 615–17 (1961). *See generally Commonwealth v. Nourse*, 177 S.W.3d 691, 697 (Ky. 2005) (discussing the scope of common authority).

"A person on the scene who identifies himself, say, as a landlord or a hotel manager calls up no customary understanding of authority to admit guests without the consent of the current occupant." *Randolph*, 547 U.S. at 112. "In these circumstances, neither state-law property rights, nor common contractual arrangements, nor any other source points to a common understanding of authority to admit third parties *generally* without the consent of a person occupying the premises." *Id.* (emphasis added).

Therefore, police cannot reasonably rely upon a landlord's grant of consent to search simply by virtue of the landlord's general property rights; this is insufficient to establish apparent authority because "the facts available to the officer at the moment" would not "'warrant a man of reasonable caution

in the belief' that the consenting party had authority over the premises[.]" *Rodriguez*, 497 U.S. at 188 (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22 (1968)).

When a landlord enters pursuant to the narrow permission granted by the emergency entry clause, the landlord can only consent to an entry by others within the scope of such clause. *See Randolph*, 547 U.S. at 112. By a tenant entering into a lease granting the landlord consent for emergency entry, the tenant has assumed the risk that the landlord will be able to take whatever steps are needed to fully resolve the emergency, including contacting police officers for help if this is necessary within the scope of the consent provided to address the emergency fully and expeditiously. *See Frazier v. Cupp*, 394 U.S. 731, 740 (1969).

A lease which provides for a right of entry for certain purposes *cannot,* however, justify entry beyond those purposes, or act as a general waiver of the right to privacy and allow a landlord to generally consent to entry by the police. *Commonwealth v. Porter*, 923 N.E.3d 36, 47 (Mass. 2010); *Commonwealth v. Davis*, 743 A.2d 946, 951-52 (Pa. Super 1999); *Arnold v. State*, 517 S.E.2d 97, 99 (Ga.App. 1999). A warrantless entry, "must be reasonable and limited in scope to the purpose of the warrantless entry[.]" *Commonwealth v. Suters*, 60 N.E.3d 383, 392 (Mass.App. 2016).

"[W]hen police are merely assisting a private party, who has authority to [enter and] search and a legitimate need to do so, courts are reluctant to exclude resulting evidence." *United States v. Capra*, 501 F.2d 267, 272 n.4 (2d Cir. 1974). While a private search could become an unreasonable police search

if the level of police involvement is too high, a key point in making such determination is who initiated the search. *State v. Archer*, 968 N.E.2d 495, 576 (Ohio App. 2011).

We return to a consideration of our sister courts' cases, this time taking the further step of considering whether landlords can properly consent to the entry of the police pursuant to the landlord's emergency authority to enter. Typically, if landlords were acting within the scope of emergency entry clauses or statutes which similarly granted them such a right and they requested assistance from governmental agents to address safety concerns related to such emergency, these Courts have determined that evidence of crimes found pursuant to such entry does not offend the Fourth Amendment. Entry by the landlord and police is justified where the landlord is acting in good faith and entering for a "very limited purpose" such as "to protect the property of an absent tenant or to safeguard [the landlord's] own property interest[.]" *State v. Koop*, 314, N.W.2d 384, 387-88 (Iowa 1982). *See State v. Huber*, 793 N.W.2d 781, 782-89 (N.D. 2011) (explaining ammonia smell justified entry by the landlord and firefighters for an emergency inspection of an apartment despite tenant's refusal to admit them, where they focused on the perceived danger and serious threat to the residents' health, which included the need to evacuate them from the building while it was extremely cold outside); *Boston Hous. Auth. v. Guirola*, 575 N.E.2d 1100, 1105-06 (Mass. 1991) (explaining where a sawed off shotgun was observed by exterminators, such emergency allowed the landlord to have police enter to remove the sawed-off shotgun to

21

protect the safety of other residents). *See also Randolph*, 547 U.S. at 118-19 (noting in *dicta* that police could enter pursuant to consent over another's objection, if the police have a good reason to believe a threat of violence exists and believe entry is needed "in order to provide any protection that might be reasonable").

Some courts have interpreted landlords' authority pursuant to emergency entry clauses more broadly and have upheld their right to consent to government agents' entry to facilitate the landlord's purposes, relying on the fact that the government agent was not there for a law enforcement purpose. In *Plane*, 274 Cal.App.2d at 4-5, the Court upheld the entry of a landlord with police officer as reasonable under the circumstances where the landlord wanted the police officer to observe that the landlord was not doing anything improper when the landlord entered after the tenant was unexpectedly arrested to turn off the apartment lights, check that the gas stove was not on, and to secure the tenant's cat. In *Jacobs*, 31 M.J. at 143-45, the Court determined that a private landlord who had entered to make plumbing repairs and found the apartment "trashed" could lawfully invite the tenant's military flight commander to inspect the apartment for the purpose of arranging necessary repairs.

In contrast, in *Williams*, the landlord's entry was not justified by an emergency as if the increased water bill indicated a leak, it was not recent and any damage was speculative, the landlord did not have a plumber coming to

22

make a repair, and there was no reason for entry by law enforcement, except to gather evidence of a crime. 354 F.3d at 504-05.

Considering the totality of the evidence and the prior non-controlling authority from our sister courts, we observe that the police search of Crite's apartment was not for the purpose of gathering any evidence but was minimally invasive and only conducted so that Robertson and the electrician could safely enter. Such entry was needed to facilitate the electrician making the emergency repairs needed to eliminate any fire risk to the four-plex, and set the stage for restoration of all services, which was required for Century to uphold its duties to Crite under the terms of the lease. During the heat of summer, Century could reasonably believe that restoring the electricity to run the air conditioning was needed for habitability. The police acted reasonably in entering given the information that Robertson had consent to enter under the terms of the lease to address an electrical hazard, but she did not feel safe to do so given the information that she had received that Crite was a schizophrenic who was off his medication, had acted irrationally in ripping out electrical wiring throughout the apartment, had a gun, was a felon, and could be present in the apartment and still acting irrationally.

Therefore, when police entry is properly requested due to a particular risk to the landlord and the landlord's agents, any such entry by officers and subsequent search by them would only be permissible so long as the officers' actions are carefully prescribed by the scope of the lease provision which provides consent for the landlord to enter and address an emergency situation.

23

Thus, we agree that entry by government agents was appropriate pursuant to the landlord's exercise of an emergency entry clause, where such entry was necessary for safety purposes so that the landlord could fulfill the duties owed to the landlord's tenants, as was the case in *Huber,* and *Koop, supra.* Following such entry, however, police officers must not engage in any search beyond what is required to allow the landlord and the landlord's agents to safely enter the premises or to address safety issues directly.

We are satisfied here that the police did not exceed the scope of the search which was authorized by the terms of the lease's emergency entry provision and the particular danger at hand. Since the risk was from a person, they could only search places where a person could be concealed. The police officers' search was appropriately limited to just clearing the apartment and such a search only took a few minutes. Therefore, the police officers appropriately restrained their actions to only those that were necessary for Robertson's and the electrician's safety.

While Crite's presence reasonably posed a risk to Robertson and the electrician, in most emergency entry situations, landlords will not require police accompaniment to safely resolve the emergency. Thus, the scope of the landlord's right to enter will typically not stretch so far as to permit landlords to consent to police entry.

Therefore, we do not go so far as to agree that governmental actors can be considered agents of the landlord under the terms of the lease. We specifically reject the holdings of *Plane* and *Jacobs, supra,* which allow the

24

entry governmental agents into tenants' homes simply because it is expedient for the landlords. While we believe in each case the landlords could properly enter pursuant to emergency clauses in their tenants' leases, the emergencies did not extend so far as permit entry by police officer in *Plane* or the commander in *Jacobs* to facilitate the needed action by the landlord. In each case, the entry of governmental agents into the tenants' apartments was for the convenience of the landlord rather than a necessity to address the scope of the emergency.

Our decision is justified not by agency law or community caretaking, but as a matter of contractual interpretation and the necessity of police assistance for safety purposes within the scope of the emergency entry provision. Here, police assistance was essential so that Robertson could safely enter with the electrician to address the pending emergency, which needed to be promptly remedied to fulfill Century's contractual duties to Crite and ensure the safety of his neighbors.

We easily reject any supposition that Robertson became an instrument or agent of the Commonwealth by contacting dispatch and requesting officers to make sure the apartment was unoccupied. Unlike in *Williams*, the situation regarding the electrical damage was urgent, and the landlord acted appropriately by promptly securing the services of an electrician and seeking help from law enforcement for safety concerns rather than for purposes of allowing the police to search to uncover the evidence of a crime. There is no

indication that Robertson acted in any matter but to further Century's interests.

The officers' objective actions were reasonable and properly confined to the scope of Robertson's request and need under all the attendant circumstances. The officers had a valid, objective basis for believing that the Robertson had the authority consent to their entry based on the emergency caused by damage to electrical system of the apartment, and the specific threat Crite posed if he were present. Therefore, the police officers' entry and search of the apartment to make sure it was unoccupied, was reasonable and permitted by the Fourth Amendment and Section 10 of the Kentucky Constitution.

**D. Could the Police Seize the AR-15 Based on Plain View?**

"It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California,* 496 U.S. 128, 136 (1990). In such circumstances, an item may be seized if the item is in plain view and its illegality is established by probable cause. *Arizona v. Hicks,* 480 U.S. 321, 326 (1987).

We previously established that the officers were properly present inside Crite's apartment and viewed the end of the rifle when making sure no one was present. The only question, then, is whether the officers both understood that they were viewing a firearm and that Crite was not entitled to possess it.

Officers Nevitt and Matthews both testified that while checking to make sure no one was inside the apartment, that they saw the "butt end" of a rifle

26

sticking out of a couch in a side room. Officer Nevitt testified that he did not have to remove the AR-15 from the couch to know that it was a firearm. Officer Matthews testified he knew that Crite was a felon.

When these facts are combined, it is evident the incriminating nature of Crite's possession of a firearm was immediately apparent. Consequentially, the officers had probable cause to remove the AR-15 from the couch and to seize it.

### III. CONCLUSION

We conclude that the landlord had a proper basis to enter Crite's apartment under the emergency entry clause in the lease because there was electrical damage which endangered the safety of the occupants of the four-plex. The landlord could properly have her agent, the electrician, enter to address this problem.

Where the landlord had information that Crite was schizophrenic, was not taking his medication, had not been admitted to the hospital for psychiatric care, did not know where Crite was but believed he had a firearm in the apartment, had recently acted in a very irrational manner in tearing apart the electrical wiring in the apartment, and the landlord needed to immediately address the electrical issues with an electrician for the safety of Crite and the other neighboring tenants, and to fulfill her duty to provide Crite with a habitable apartment, it was reasonable for the landlord to request and receive police assistance in making sure the apartment was safe for her and the electrician to enter.

Considering the totality of the circumstances, a limited search by the police just to make sure no one was inside the apartment was objectively reasonable and did not violate Crite's Fourth Amendment rights because the search was minimally invasive, stayed within the confines of what was necessary to protect the landlord, and was not undertaken to search for evidence of a crime. When the police are lawfully present and observe and seize an incriminating item pursuant to plain view, the Fourth Amendment is not offended. Accordingly, the Daviess Circuit Court properly denied Crite's motion to suppress, and we affirm his conviction and sentence.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Kathleen K. Schmidt
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Elizabeth Hedges
Assistant Solicitor General